**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEW YORK STATE VEGETABLE GROWERS ASSOCIATION, INC.; A& J KIRBY FARMS, LLC; PORPIGLIA FARMS, INC.; CRIST BROS ORCHARDS, INC.; CAHOON FARMS, INC.; and LYNN-ETTE & SONS, INC. *Plaintiffs,* v. KATHLEEN HOCHUL, in her official capacity as Governor of New York; LETITIA JAMES, in her official capacity as Attorney General of New York; JOHN WIRENIUS, in his official capacity as Chairperson of the New York Public Employment Relations Board; SARAH G. COLEMAN, in her official capacity as the Deputy Chair of the New York Public Employment Relations Board and an Administrative Law Judge of New York Public Employment Relations Board; MARIAM MANICHAIKUL, in her official capacity as the Director of the New York Public Employment Relations Board's Office of Private Employment Practices & Representation and an Administrative Law Judge of New York Public Employment Relations Board. *Defendants.* | CASE NO. 23-CV-1044 _____ |

**VERIFIED COMPLAINT**

Plaintiffs A& J KIRBY FARMS, LLC ("Kirby"); PORPIGLIA FARMS, INC. ("Porpiglia"); CRIST BROS ORCHARDS, INC. ("Crist Bros"); CAHOON FARMS, INC. ("Cahoon"); LYNN-ETTE & SONS, INC. ("Lynn-Ette") (collectively, "Farm Plaintiffs"), and NEW YORK STATE VEGETABLE GROWERS ASSOCIATION, INC. ("NYSVGA"),  by and through undersigned counsel, hereby bring this Verified Complaint against Defendants KATHLEEN HOCHUL, in her official capacity as Governor of New York; LETITIA JAMES, in her official capacity as Attorney General of New York; JOHN WIRENIUS, in his official capacity as Chairperson and Member of the New York Public Employment Relations Board; SARAH G. COLEMAN, in her official capacity as the Deputy Chair of the New York Public Employment

1

Relations Board and an Administrative Law Judge of New York Public Employment Relations

Board; and MARIAM MANICHAIKUL, in her official capacity as the Director of the New York

Public Employment Relations Board's Office of Private Employment Practices & Representation

and an Administrative Law Judge of New York Public Employment Relations Board.

Verifications by each Plaintiff are enclosed with this Complaint, wherein each Plaintiff

swears under penalty of perjury that the corresponding identified paragraphs of the Complaint are

true to the best of their knowledge. Pursuant to 28 U.S.C. § 1746, these verifications under penalty

of perjury have the same force and effect as a notarized affidavit or declaration.

## **NATURE OF THE ACTION**

Plaintiffs seek temporary, preliminary, and permanent injunctive relief, as well as a

declaratory judgment, attorneys' fees, and other damages and equitable relief as justice may

require.

Plaintiffs' narrow request for relief involves only the 2020 amendments to the State

Employment Relations Act ("SERA"), which were enacted into law as part of the Farm Laborers

Fair Labor Practices Act ("FLFLPA") (collectively and interchangeability, "the Act"). *See* SERA

§ 701–718.[1]

---

[1] The relevant statutory provisions are found in Chapter 31, Article 20, Sections 700–718 of the New York Labor Law Code. Plaintiffs cite to these provisions as SERA § 700, *et al*. For convenience, the relevant statutes are available here: https://perb.ny.gov/new-york-state-employment-relations-act/. The relevant regulatory provisions of PERB are in Title 12, Chapter IV of the New York Administrative Code. See N.Y. Comp. Codes R. & Regs. tit. 12, §§ 263.1–263.123. Plaintiffs cite to these regulations as PERB Rule § 263, *et al*. For convenience, these regulations are available here: https://perb.ny.gov/sera-rule/. Where necessary, Plaintiffs may cite to a Prior PERB Rule, meaning the regulatory scheme in effect until the February 15, 2023 amendments. A copy of these prior rules is attached to Plaintiff's Complaint as **Exhibit 1**.

## PRELIMINARY STATEMENT

When signing the FLFLPA into law, then-Governor Cuomo proclaimed that the Act would simply provide farmworkers with "the same protections that other workers have enjoyed for over 80 years."[2] Rather than effectuating that reasonable and straightforward proposition, however, the FLFLPA radically transformed the State's labor laws at the expense of both farmworkers and farmers alike. The State of New York became the first—and only—jurisdiction in the country to prevent private sector workers from exercising their right to vote for a labor representative through a fair and free secret ballot election.

And *unlike* their counterparts in other industries, New York's agricultural employees also have no meaningful freedom of association when it comes to labor unions—no right to refrain from union organizing, no right to petition for decertification of a labor union, no right to strike, no right to revoke an unintended union dues authorization, and no right to present their grievances on their own behalf to a neutral decisionmaker.

In fact, the State removes workers and farms from the process entirely—instead of allowing workers to negotiate with their employer and reach a mutually agreeable collective bargaining agreement, the FLFLPA provides that if they do not reach a final comprehensive agreement within as little as 70 days following certification of a representative, a government-designated arbitrator will draft a compulsory "contract" between each farm and labor union. This unconstitutional compulsory arbitration scheme results in a "collective bargaining agreement" that was neither collectively bargained nor agreed-upon. This resultant government decree carries the force of law and can govern a workplace for years. The State enforces this regulatory scheme with the threat of civil and criminal penalties, including the threat of ***imprisonment***. *See* SERA § 709.

---

[2] https://www.wcb.ny.gov/content/main/PressRe/governor-cuomo-signs-farm-workers-bill.pdf.

New York's statutory scheme is completely divorced from the basic tenets of labor law codified in the long-standing landmark National Labor Relations Act ("NLRA"). Even worse, it offends core constitutional principles by depriving both farms and farmworkers of their fundamental rights without any semblance of due process or equal protection under the law.

The text of the FLFLPA is just the tip of the proverbial constitutional violation iceberg. Through its Public Employment Relations Board ("PERB"), the State of New York has impermissibly invented new legal standards out of whole cloth—standards, rules, and obligations that have been arbitrarily enforced against the State's agriculture industry with no predictability or consistency. Along the way, PERB has repeatedly denied farms the opportunity to be heard or present evidence before issuing binding orders that drastically alter their operations and have long-lasting impacts on their current and future workers.

Under the rulings of PERB's administrative law judges, farmers are compelled "to bargain over terms and conditions of employment that will apply to H-2A workers before such workers are actually employed" based on the "votes" (union card signatures) of a prior group of H-2A workers who "have returned to their home countries and are not employed." In other words, PERB quite literally envisions the actual workers covered by the agreements *having no seat at the bargaining table*.

Moreover, under federal law, H-2A workers and their employers must strictly adhere to the terms and conditions of employment set forth in their binding H-2A work contracts—which must be pre-approved by U.S. Department of Labor ("U.S. DOL") and cannot be changed during the term of the contract. By entrenching H-2A workers as permanent bargaining unit employees, the State effectively threatens to supersede the federal government's comprehensive regulatory scheme that farmers must navigate each year to contract with temporary guestworkers under the

H-2A program. And because these work contracts and the H-2A regulations govern nearly every aspect of the work relationship—wages, benefits, job duties, early termination for cause, housing rights, paid travel from the worker's home, paid travel back to the worker's home, and more—the state-compelled collective bargaining agreements would provide no discernable benefit to the workers.

Indeed, Congress designed the H-2A program to prevent employers from using foreign guestworkers to undercut the job opportunities and working conditions of qualified domestic workers. Federal law prohibits farms from offering permanent employment or giving hiring preference to H-2A workers. No matter how PERB interprets the FLFLPA, the State cannot order "reinstatement" of H-2A workers whose temporary work contracts have ended.

New York's ongoing failure to recognize the supremacy of federal immigration law forces farms to choose between complying with their obligations under the H-2A program and their obligations under New York law. For instance, PERB continues to prosecute unfair labor charges against farms for alleged "failure to recall" H-2A workers year-over-year—yet, under federal immigration law, agricultural employers may only hire foreign H-2A guestworkers for a contractually defined limited term, and only after certifying that no qualified domestic workers can fill the positions. Farms have a ***duty*** to hire qualified domestic workers and make all reasonable efforts to ***not*** contract with any H-2A workers.

When H-2A workers realize that they have no seat at the bargaining table and no benefits to gain from paying union dues, many of them understandably ask to opt out of the bargaining unit. Others tell the farms or PERB that they never realized signing union cards constituted a "vote" for bargaining representation. The State, however, has essentially delegated its rulemaking authority to private sector labor unions. Under New York law, neither farms nor workers are

afforded a meaningful opportunity to present evidence that union cards submitted in support of a representation petition were forged or fraudulently obtained. Neither farms nor workers are provided any due process before they are compelled to associate and facilitate wage deductions and payments to a labor union. Rather, the out-of-state union organizers have full discretion to dictate to workers how and when their dues deduction authorization cards can be revoked—according to PERB, the language on the cards printed by the union carries the force of law with respect to revocation. And farms are forced to enter into binding "agreements" with third party labor unions even if all of the individuals in the certified bargaining unit are no longer employed by the farm.

Against this backdrop, Plaintiffs are left with no choice but to seek judicial intervention in preserving their constitutional rights and restoring fairness to labor relations for farmers and farmworkers in New York. As set forth below, Defendants continue to engage in ongoing and imminently threatened violations of numerous constitutional provisions. Plaintiffs respectfully request that this Court declare SERA, as amended by the FLFLPA, unconstitutional facially, unconstitutional as applied to private sector agricultural employers and farm laborers, and unconstitutional as applied to Plaintiffs, and that this Court enjoin Defendants from taking any further enforcement actions against agricultural employers and Plaintiffs.

## PARTIES

### Plaintiffs [3]

1.      Plaintiff NYSVGA is one of the oldest agricultural organizations in New York. Founded in 1911, the association is a not-for-profit corporation that serves commercial fresh market, storage, and processing vegetable growers. NYSVA's members consist of farm growers of varying sizes. It is guided by a fifteen-member Board of Directors who represent the major commodities produced throughout the State, and is headquartered in Genesee County, New York. NYSVGA plays a vital role in educating members and helping them to comply with laws to remain competitive in a commodity-based market that trades internationally.

2.      Plaintiff Crist Bros Orchards is a family-owned business that owns and operates apple orchards in New York's Hudson Valley region. The Company's vertically integrated agricultural operations include growing, harvesting, storage, packing, and shipping. Crist Bros farms approximately 662 acres of orchards, which produce about 600,000 bushels of apples per year. For about the last eight years, Crist Bros has participated in the H-2A program to supplement its workforce amid domestic labor shortages.

3.      Plaintiff Porpiglia Farms is a family-run small business led by Anthony and Joseph Porpiglia for more than 40 years. The two brothers own and operate apple farms across 6 locations and 550 acres in Ulster County, New York. The Company's operations include apple harvesting, packing, and storing.  Porpiglia invests heavily in its operations and its employees. At peak season, Porpiglia typically employs more than 100 workers, including 8 members of the Porpiglia family. Like many New York farms, Porpiglia relies heavily on H-2A guest workers. These H-2A workers

---

[3] The individual farm Plaintiffs (i.e., all Plaintiffs other than NYSVGA) are collectively referred to as the "Farm Plaintiffs."

are on seasonal contracts during peak harvest season, typically from July to November. Pursuant to H-2A program requirements, Porpiglia enters into federally approved work contracts with these workers at the beginning of each season.

4.      Plaintiff Kirby Farms is a family-run small farm that grows and harvests a wide variety of crops and commodities across 1700 acres of land in Orleans County, New York. The Kirby family has owned and operated Kirby Farms since 1878. Kirby uses the majority of its land to farm "field crop" such as corn, soybeans, and green beans. These field crops are machine harvested without the need for extensive manual labor. Accordingly, Kirby runs a lean operation of only four (4) to six (6) year-round agricultural employees. These employees operate the machinery and perform other tasks related to the field crops. Kirby only requires additional labor for its 170 acres of apple orchards, which constitute about 10% of the Company's farmland. Although Kirby has traditionally hired seasonal domestic workers to harvest its apples, the domestic labor shortage has led to Kirby participating in the federal H-2A program.

5.      Plaintiff Cahoon Farms is a family-owned farm located in Wayne County, New York, that grows and harvests apples on land leased from other orchard owners and operates a processing plant for the processing of apple products. The Cahoon family has owned and operated Cahoon Farms since 1943.  Due to a domestic labor shortage, Cahoon Farms has participated in the federal H-2A program to provide seasonal workers to work in the apple orchards, which in recent years involved a smaller group of H-2A workers from mid-April through the end of the harvest season in November and a larger group of H-2A workers who begin work in August and also work through the end of the harvest season.

6.      Plaintiff Lynn-Ette & Sons is a family owned and operated farm located in Orleans County, New York.  It has been owned and operated by the Roberts family since the early 1950s.

Lynn-Ette grows a variety of produce and grains, including but not limited to soybeans, wheat, field corn, cabbage, green beans, corn, squash, peppers, and cucumbers.  In addition, it provides packing services for the grains and/or the produce it harvests.  Lynn-Ette employs both full-time and seasonal domestic employees to assist with its year-round operations.  However, due to the domestic labor shortage, Lynn-Ette utilizes H-2A guest workers to supplement its workforce.

**Defendants**

7.       Defendant Kathleen Hochul is the current Governor of New York and has, among many responsibilities, the authority to sign into law bills tendered by the New York  Legislature and to oversee enforcement and administration of those laws. Governor Hochul's predecessor, former Governor Cuomo, signed the FLFLPA into law on July 17, 2019. Governor Hochul continues to enforce the Act. Governor Hochul also oversees and administers the PERB. The Governor appoints all Members of PERB, and the Governor designates one member of the Board to serve as Chair. Governor Hochul maintains her principal place of business in the State Capitol Building in Albany, New York, and she oversees offices located throughout the State.

8.       Defendant Letitia James is the Attorney General of New York, the State's chief legal officer. She oversees prosecutions and legal proceedings, and she enforces state laws. She maintains her principal place of business in the State Capitol Building in Albany, New York, and she oversees offices located throughout the State.

9.       Defendant John Wirenius is the Chairperson of PERB, in addition to being a Member of the PERB Board. The Chairperson is the chief executive officer for the agency, responsible for carrying out policies set by the Board and for overseeing the function and administration of agency program sections. The Chairperson maintains and supervises an executive staff composed of the Executive Director, the Deputy Chair, and each of the program

directors. Each member of the three member PERB Board has an equal vote on decisions of the Board and any two members may constitute a majority. The Board enforces, interprets, and adjudicates the union organizing, unfair labor practice, and impasse arbitration provisions of the FLFLPA, as well as all provisions of SERA. As described on the agency's website, the responsibilities of the Board also include: (1) setting policy standards for the agency; (2) issuing final agency rulings on appeal from decisions and rulings by agency program sections; (3) assigning appropriate penalties against unions found to have engaged in work stoppage activities; (4) issuing rulings, as appropriate, regarding certification of unions seeking to represent public employees, and the proper maintenance of provisions and procedures by local governments establishing "mini-PERBs;" (5) enacting Rules of Procedure by which parties and agency personnel are bound; and (6) maintaining an appropriate panel of qualified labor relations neutrals to provide mediation, fact-finding and interest arbitration services on a per diem basis.[4]

10.     Defendant Sarah Coleman is the Deputy Chair of the PERB.  The Deputy Chair acts as the chief legal advisor to the Board. She is responsible for handling all procedural matters which arise in connection with cases pending before the Board, including requests for oral argument, extensions of time, and other motions, upon consultation with the Chair and Board members as requested. She is responsible for assuring a timely flow of cases to final disposition by the Board, and is responsible for conducting legal research and analysis, and the drafting of Board decisions for review and adoption by the Board. The Deputy Chair also advises the Chair and the Board concerning Board policies and possible amendments to the Board's Rules of

---

[4] The duties and responsibilities of the Board, its Members, and its Deputy Chair are described here: https://perb.ny.gov/office-of-the-chairman/.

Procedure. Defendant Sarah Coleman also served as a PERB Administrative Law Judge (Hearing Officer) in SERA and FLFLPA matters, and she also served as Acting Director through July 2023.

11.     Defendant Mariam Manichaikul is the Director of Private Employment Practices and Representation ("PEPR"), an Office within the PERB agency. PEPR, which was officially created on February 15, 2023 as part of the PERB Rule Amendments, investigates, interprets, and adjudicates matters and controversies involving non-public employers, employees, and labor unions. The Office administers the State Employment Relations Act (SERA), including the amendments in the FLFLPA. The Office has two general areas of responsibility: representation and unfair labor practices.  Representation deals with petitions regarding representation of certain private sector employees, including farm laborers.  Unfair labor practices are charges filed by individuals or labor organizations alleging violations of Section 704 or 704-b of SERA. Defendant Sarah Coleman previously also held the title of Acting Director of Private Employment Practices and Representation. Like Defendant Coleman, Defendant Manichaikul also serves as an Administrative Law Judge (Hearing Officer) in both representation and unfair labor practice matters under SERA and the FLFLPA.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 2201, and 2202, as well as 42 U.S.C. § 1983, because Plaintiff's claims arise under the United States Constitution and federal statutes, and this action presents questions of federal law.

13.     This Court has general personal jurisdiction over Defendants because Defendants are domiciled in the State of New York.

14.     This Court has specific personal jurisdiction over Defendants because Defendants have caused or threatened to cause imminent injury to Plaintiffs in the State of New York and in this judicial district.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b) and § 1391(c)(2) because a substantial part of the acts and omission that gave rise to Plaintiffs' claims occurred in this judicial district.

16.     Venue and jurisdiction are also proper in this Court because Defendants are representatives of the State of New York and thus reside in the State of New York and in this district, and PERB maintains an office in this judicial district in Buffalo, New York.

## JUSTICIABILITY

17.     Plaintiffs have standing under the Declaratory Judgment Act, 28 U.S.C. § 2201 because an actual and immediate controversy exists between the Parties.

18.     Plaintiffs have standing because Defendants have caused or threatened to cause imminent injury to Plaintiffs, and Plaintiffs' injuries are redressable by this Court.

19.     Plaintiff NYSVGA has standing because one or more of its members has standing and the association's interests are germane to this litigation.

20.     Plaintiffs have standing to seek prospective relief under Article III of the U.S. Constitution because Plaintiffs allege an ongoing violation of federal law and seek prospective relief against state officials, including injunctive and declaratory relief.

21.     Plaintiffs' claims meet the requirements of *Ex parte Young*, 209 U.S. 123 (1908), because Plaintiffs seek to bring New York law and the state's regulatory scheme into compliance with federal law. To satisfy the *Ex parte Young* exception to Eleventh Amendment immunity, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing

violation of federal law and seeks relief properly characterized as prospective." *Verizon Md. Inc.*

*v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) (cleaned up).

22.     Plaintiffs seek declaratory, injunctive, and equitable relief to prohibit Defendants

from any additional or future unlawful actions and constitutional violations. Plaintiffs seek to

preclude Defendants from continuing their illegal policies or practices.

23.     Plaintiffs have standing to bring a pre-enforcement challenge to state laws and

regulations because PERB has announced its intention to prevent Plaintiffs from engaging in

planned conduct, including conduct that Plaintiffs have regularly engaged in prior to the enactment

and enforcement of the FLFLPA, as well as conduct that Plaintiffs must engage in to comply with

federal law and to operate their business.

24.     Farm Plaintiffs have also already been subjected to enforcement actions by PERB.

25.     Plaintiffs' claims are ripe for adjudication because Plaintiffs remain under threat

that Defendants will use, and in fact Defendants have used, their power to unlawfully apply and

enforce state law against Plaintiffs; that application or enforcement of state law is unconstitutional

and preempted by federal law; and Plaintiffs' claims are fit for judicial decision because the claims

present pure questions of law and no further factual development is necessary to adjudicate

Plaintiffs' claims.

## STATEMENT OF FACTS

### The Farm Laborers Fair Labor Practices Act (FLFLPA)

26.     In 2019, the New York Legislature passed, and the Governor signed, the Farm

Laborers Fair Labor Practices Act ("FLFLPA" or "Act"). Most provisions of the Act became

effective January 1, 2020.

27.     After some provisions of the Act were enjoined by the Western District of New York, see Case No. 1:19-cv-01720-LJV-MJR, the Legislature amended the FLFLPA. The Governor signed those amendments into law on April 3, 2020. That case and those amendments involved the wage and hour provisions of the FLFLPA, which are administered by the State's Department of Labor.

28.     The FLFLPA also amended the State Employment Practices Act ("SERA"), which is administered by PERB.

29.     The FLFLPA expanded SERA's coverage to include private sector agricultural employers and farm laborers in the State of New York. *See* SERA § 701(2)(b); 701(3)(c).

30.     The FLFLPA also added SERA Section 702-b, titled "Impasse resolution procedures for agricultural employers and farm laborers." Under that Section, PERB "shall render assistance" to private parties engaged in collective bargaining negotiations, including through declaring an impasse as soon as 40 days after PERB certifies a labor union as the exclusive bargaining representative of a workplace. Either the labor union or the employer can declare an impasse.

31.     Upon declaration of an impasse, PERB "shall appoint a mediator." SERA § 702-b(3)(a). The statute provides that the parties then have 30 days to negotiate with the assistance of the government-appointed mediator before "either party may petition the board to refer the dispute to a neutral arbitrator." §702-b(3)(b). If the parties do not agree on an arbitrator within seven days, "the board shall submit to the parties a list of qualified, disinterested persons for the selection of a neutral arbitrator," and the parties must use a panel strike process to select an arbitrator from this government-mandated list.

14

32.     Under the FLFLPA, the State-appointed arbitrator is empowered to resolve the parties' dispute by directing the terms of a collective bargaining agreement that will govern the farm and any of its current and future employees included in a bargaining unit deemed appropriate by the State. The collective bargaining agreement drafted by the arbitrator "shall be final and binding upon the parties." SERA § 702-b(3)(iv).

33.     Although Section 702-b only allows the arbitrator-compelled agreement to be effective for a maximum of two years, the FLFLPA requires employers to "continue all the terms of an expired agreement until a new agreement is negotiated." SERA § 704(2)(b).

34.     Although the statute includes a list of "factors" that the arbitrator is only required to  "take into consideration" when making a "determination of the matters in dispute," the statute does not include any limitations on the scope of matters and issues that may be resolved through this compulsory arbitration process. The State, through its agency arbitrator, has unlimited power to compel private sector agricultural employers to implement any employment or business practice that a labor union deems to be "in dispute." This compulsory and binding arbitration process applies to private sector employers who have never signed arbitration agreements or otherwise consented to this non-judicial adjudication.

35.     The FLFLPA makes all unfair labor practices in SERA Section 704 applicable to agricultural employers.

36.     The FLFLPA also adds SERA Section 704-b to make it an unfair labor practice for any agricultural employer to 1) "lockout" its laborers; 2) refuse to continue the terms of an expired collective bargaining agreement; and 3) "discourage union organization or to discourage an employee from participating in a union organizing drive, engaging in protected concerted activity,

or otherwise exercising the rights guaranteed under this article." The phrase "discourage union organization" is not defined by the statute.

37.     Employers are only permitted to file an unfair labor practice charge if a labor union engages in an unlawful strike.

38.     There is no provision that permits employees to file an unfair labor practice charge against a union.

39.     Under SERA Section 706(3), PERB is empowered to order, among other things, "reinstatement with or without back pay" of any employee upon finding that the employer has engaged in an unfair labor practice.

40.     Under SERA Section 705, as amended by the FLFLPA, a labor union can be certified to be the exclusive bargaining representative of a farm's employees "after a showing of majority interest." PERB "shall ascertain such employees' choice of employee organization, on the basis of dues deduction authorization and other evidence, or if necessary by conducting an election." However, "[i]f the choice available to the employees in a negotiating unit is limited to selecting or rejecting a single employee organization, that choice shall be ascertained by the board on the basis of dues deduction authorizations instead of by an election." SERA § 705(1-a).  This process is known as "card-check" and New York is the first state to permit private sector unionization through this process.

41.     SERA Section 709 criminalizes willful violations of the statute under threat of a $5,000 fine and "imprisonment for not more than one year."

42.     The remaining provisions of SERA, as amended by the FLFLPA, are incorporated herein by reference.

**Public Employee Relations Board (PERB)**

43.     The provisions of SERA and the FLFLPA are enforced, interpreted, and adjudicated by PERB.

44.     PERB maintains and administers a set of substantive rules that govern the rights of agricultural employers and employees. *See* https://perb.ny.gov/sera-rule/.

45.     In the first three years after the effective date of the FLFLPA, PERB did not update or change its rules that had previously applied almost exclusively to the public sector. Agricultural matters were handled and processed under the prior SERA rules. The agency provided little to no guidance or notice to agricultural employers as to their obligations under those rules.

46.     Representation petitions were filed against the Farm Plaintiffs during this time period. The Farm Plaintiffs and their counsel were served with these petitions and tasked with interpreting the vague, ambiguous, imprecise, and often contradictory statutory provisions and PERB rules in order to decipher the proper method and procedure of responding to these petitions. If PERB decided that a farm had not adequately responded to a petition within 10 calendar days, the farm was barred from providing a response prior to the agency certifying a collective bargaining representative. In fact, as further detailed below, when processing representation petitions and objections to petitions, PERB applied inconsistent processes and issued contradictory and inconsistent decisions as applied to almost identical situations.

47.     Under the PERB regulations applicable to private agricultural employers—including the Farm Plaintiffs—until February 15, 2023, PERB could only order certification of a labor union as the exclusive bargaining representative for a workplace after receiving a "petition for investigation." PERB Rule § 251.1. A copy of these prior rules is attached hereto as **Exhibit 1**. The Petition for Investigation "shall contain . . . an allegation that a question or controversy

exists concerning representation and a concise statement setting forth the nature thereof." § 251.3(f).

48.     Prior PERB Rule § 251.15 contemplated the PERB should conduct an "investigation of a question or controversy concerning representation," and that "[i]n the course of its investigation," PERB "may certify a labor organization as the exclusive representative for purposes of collective bargaining when the labor organization demonstrates a showing of majority support by employees in an appropriate unit for purposes of collective bargaining." PERB delegated to its "director" the task of determining whether employees have chosen a bargaining representative: "The director shall ascertain employee choice of a labor organization on the basis of dues deduction authorization and other evidence." § 251.15(a). Further, the prior rules expressly precluded any challenges or second-level review of finding in some circumstances: "The determination by the director that the indications of employee support are not sufficient for certification without an election is a ministerial act and will not be reviewed by the board." § 251.15(b). However, when "the director determines that the indications of employee support are sufficient for certification without an election," the director "shall inform all parties in writing," and that determination "is reviewable by the board pursuant to a written objection to certification filed with the board by a party within five working days after its receipt of the director's notification." *Id.*

49.     Prior PERB Rule § 251.17 provided that "Subject to the approval of the director, the parties to a representation proceeding may waive a hearing and agree on the method by which the board shall determine the question of representation."

50.     Prior PERB Rule § 251.6 provided that a petition for investigation and certification may be amended or withdrawn "at any time before the issuance of a notice of hearing."

51.     In a contradiction with other rules that delegated power to decide on representation issues to the "director," prior PERB Rule § 251.18 expressly contemplated the involvement of a separate administrative law judge who would make the final decision after a hearing, which would then be transmitted to the full Board for review: "Upon completion of proceedings, the administrative law judge shall issue a decision and submit the record of the case to the board. The record shall include the petition, response, notice of hearing, motions, rulings, orders, stenographic report of the hearing, stipulations, exceptions, documentary evidence, any briefs or other documents submitted by the parties . . . ."

52.     Finally, prior PERB Rule § 251.25 provided that "The board, upon the completion of its investigation, shall certify to the parties the name or names of the representatives selected, if any, or make other disposition of the matter."

53.     Thus, on their face, these inherently vague, imprecise, confusing, and inherently contradictory regulations provided no real guidance or notice to the parties as to who, how, or when petitions would be processed, or certifications could be issued. But, at minimum, the regulations seemingly contemplated that an investigation would occur prior to certification, either by a director, with an assigned administrative law judge at a hearing, and/or by the full Board.

54.     In 2022, PERB promulgated new proposed rules. Various farms and industry groups submitted comments urging the agency to adhere to its narrow statutory authority, implement fair procedures, and protect the due process rights of employers and laborers alike. Many of these comments pointed out the ambiguities and inconsistencies in the proposed rules, as well as the potential constitutional problems that the agency must rectify before implementing its final rules. These comments were ignored, denied, and rejected. The only public response to comments published before the new rules became effective was a document that was briefly

published on the agency's website, only to be inexplicably removed from the website after some

of the Farm Plaintiffs began citing to it in their briefs. A copy of that document from January 2023

is attached here as **Exhibit 2**.

55.      In response to a comment that impasse arbitration "should be a choice, not a

mandate," PERB stated, in full, "Impasse arbitration is specifically provided for by the FLFLPA."

(Ex. 2, p. 19).

56.      In response to a comment that "Farms should not be required to pay for arbitration

which it has not requested," PERB replied that it "lacks the authority to change this statutory

provision." (Ex. 2, p. 19).

57.      PERB's responses to comments further confirmed that "parties remain free to set

parameters on their bargaining, but once a matter proceeds to impasse arbitration, the arbitrator

sets the parameters of the award." (Ex. 2, p. 20). Relatedly, PERB announced that "it is clear from

the statutory framework that the Legislature intended for impasse arbitration to be an expeditious

process." (Ex. 2, p. 22).

58.      Other comments noted the extremely short deadlines only applicable to agricultural

employers, the draconian sanctions for failure to meet any of the response deadlines, and the lack

of employee rights to vote in a secret ballot election. One commenter noted that the proposed rules

"denies them due process." PERB did not substantively respond other than to reject a suggestion

to mirror the federal NLRB rules because "[t]he NLRA is not applicable to farmworkers." (Ex. 2,

p. 22.)

59.      PERB's proposed rules became final and effective on February 15, 2023.

60.      These new rules enacted Section 263, which only applied to agricultural employers

and farm laborers, as well as other changes and amendments. The new rules significantly changed

both the procedures applicable to FLFLPA cases and the substantive rights and obligations of agricultural employers, farm laborers, and labor unions. A copy these rules showing the amendments is attached hereto as **Exhibit 3**, and the current rules are also available here: https://perb.ny.gov/sera-rule/.

61.     The agency provided no public guidance regarding whether the rules would apply retroactively to representation cases filed against employers prior to February 15, 2023.  PERB removed from its rules a provision from the last time they were amended in 2013, which provided the rules "shall also govern all proceedings then pending, except to the extent that in the judgment of the board their application to such pending proceedings would not be feasible or would work injustice." (Ex. 3, p. 29.)   This lack of guidance becomes especially consequential when considering that petitions were filed against the Farm Plaintiffs in November 2022 (when the old rules applied) but the Certification Decisions were not issued until April 2023 (after the effective date of the new rules). PERB applied case-dispositive provisions of the new rules to certify labor unions and define bargaining units without elections, hearings, or any meaningful opportunity for the employers to present evidence. At the time that employers responded to the petitions in November and December 2022, they had no notice regarding when and if the proposed rules would be implemented and applied to these petitions, and thus no opportunity to respond and appropriately assert the proper legal arguments.

62.     The PERB Rules remain inconsistent internally as well as inconsistent with the text of SERA and the FLFLPA. They are filled with ambiguities, undefined terms, and inexplicably vague provisions. Simply put, it is impossible for New York farmers to read the Rules and have notice of their obligations and rights under the law.

63.     Even worse, PERB's application and interpretation of its own Rules (and of the statute) has proven unworkable, inconsistent, and divorced from any semblance of rule of law. As illustrated through the experiences of each of the Farm Plaintiffs (detailed below), PERB has routinely ignored binding law, selectively enforced rules, and even invented new, case-dispositive legal standards out of whole cloth and with no notice.

64.     From inception through July 2023, Defendant Sarah Coleman, the Deputy Chair of PERB, handled all aspects of representation and unfair labor practice proceedings involving the Farm Plaintiffs. She was tasked with performing all administrative, investigative, and adjudicative functions with respect to these matters. She also appointed herself to act as administrative law judge (a title that PERB uses interchangeably with "hearing officer") and issued orders and decisions in multiple matters.

65.     Although the February 15, 2023 rule amendments created a new Office of Private Employment Practices and Representation to handle private sector matters, Coleman was the Director of this Office until July 2023. Coleman thus simultaneously served as Director, Hearing Officer, and Deputy Chair of the Board. As Director, she conducted factual investigations of threshold issues and other unreviewable "ministerial" acts. As Hearing Officer, she adjudicated legal disputes, made factual findings, and issued binding Certification Decisions and Bargaining Orders. As Deputy Chair, she advised the Board and drafted decisions for matters on appeal to the Board. This structure renders the right to appeal from the hearing officer's decisions to the full Board illusory.

66.     On July 10, 2023, the Farm Plaintiffs were notified that Defendant Mariam Manichaikul would take the place of Sarah Coleman as both the Director of Private Employment

Practices and Representation and as the Administrative Law Judge in all pending and future representation and unfair labor practice proceedings.

**The H-2A Temporary Guestworker Visa Program**

67.     The Immigration and Nationality Act ("INA"), as amended by the Immigration Reform and Control Act of 1986 ("IRCA"), established a comprehensive and complete code governing, among other things, the conditions of lawful employment with respect to noncitizens.

68.     For purposes of determining the scope of a noncitizen's lawful work authorization, the INA distinguishes between various distinct classifications and sub-classifications. 8 U.S.C. § 1101(a). The statute first divides noncitizens ("aliens") into two broad groups: "immigrants" and "nonimmigrants." Generally speaking, immigrants may lawfully live and work in the United States on a permanent basis. By contrast, the category of "nonimmigrant" includes those who seek temporary entry into the country for specific, time-limited purposes, such as ambassadorships, tourism for pleasure, or—as relevant here—the performance of specific employment service. *Id.* § 1101(a)(15)(A)-(V).

69.     The common shorthand "H-2A worker" comes from the subcategory set forth in subsection (H)(ii)(a) as a nonimmigrant "having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform agricultural labor or services, as defined by the Secretary of Labor in regulations and including agricultural labor defined in section 3121(g) of Title 26, agriculture as defined in section 203(f) of Title 29, and the pressing of apples for cider on a farm, of a temporary or seasonal nature." *Id.* § 1101(a)(15)(H)(ii)(a).

70.     The H-2A visa program is governed by some of the most complex and burdensome regulations in the entire Federal Register. The statute and its regulations thoroughly govern almost

every aspect of the relationship between a participating agricultural employer and temporary H-2A visa-holding guestworkers.

71.     H-2A workers are granted a unique set of labor protections not applicable to most domestic (U.S. permanent resident or citizen) workers or most other classifications of nonimmigrants under the INA. H-2A workers are not at-will employees. Rather, they work pursuant to a term-limited work contract with their employer, and every term of this contract must be pre-approved by the federal government before the farm can participate in the program and before the workers can be granted visas to enter the country.

72.     In enacting the H-2A program, Congress intended to enshrine into law a preference for promoting the domestic labor force. In fact, the H-2A certification process involves the government certifying that importing these workers "will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1). Every facet of the statute is expressly designed to protect domestic workers. Likewise, the Department of Labor is obligated to promulgate H-2A regulations against that backdrop. Congress did not want farms to undercut domestic wages and job opportunities through hiring foreign guestworkers.

73.     As a matter of law, H-2A workers may not be permanent, year-round employees, and the employer cannot guarantee year-to-year employment to such workers. 8 C.F.R. § 214.2(h)(5)(iv)(A) (requiring H-2A employment to be "temporary or seasonal"); *id.* § 214.2(h)(15)(ii)(C) (recognizing that H-2A employees are typically permitted to stay for "a period of up to one year").

74.     Agricultural employers may not enter into contracts with new or returning H-2A workers without first obtaining a certification from the Secretary of Labor establishing that there

is a shortage of U.S. workers who are able, willing, and qualified to perform the labor or services at issue. 8 U.S.C. § 1188(a)(1). Employers must re-apply for, and receive, this certification each year that they seek to participate in the H-2A program. The government can only issue an H-2A certification upon a finding that an employer's use of foreign guestworkers "will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1).

75.     "The employer must provide to an H–2A worker . . . a copy of the work contract between the employer and the worker" as part of the visa application process and "no later than on the day work commences." 20 C.F.R. § 655.122(q). Federal law expressly requires that these work contracts govern all aspects of the employment relationship; the work contract must contain "[a]ll the material terms and conditions of employment relating to wages, hours, working conditions, and other benefits." 20 C.F.R. § 655.103(b). See also 20 C.F.R. § 655.122(b) (bona fide job qualifications); 20 C.F.R. § 655.122(d) (housing); 20 C.F.R. § 655.122(e) (workers' compensation); 20 C.F.R. § 655.122(g) (meals); 20 C.F.R. § 655.122(h) (transportation); 20 C.F.R. § 655.122(i) (guaranteed number of hours and guaranteed piece rate); 20 C.F.R. § 655.122(j) (recordkeeping); 20 C.F.R. § 655.122(k) (itemized hours and earning statements); 20 C.F.R. § 655.122(l) (rates of pay); 20 C.F.R. § 655.122(m) (frequency of pay); 20 C.F.R. § 655.122(n) (termination for cause); 20 C.F.R. § 655.122(p) (paycheck deductions).

76.     Unlike the otherwise nearly identical H-2**B** regulations, the H-2**A** regulations do not contemplate collective bargaining or labor unions. For instance, the H-2B regulations specifically provide that the employer should not "intimidate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against" anyone who, among other things, "[c]onsulted with a . . . labor union." 20 C.F.R. § 655.20(n). The H-2A regulations include the same prohibitions

on the employer "intimidating . . ." but with one crucial difference—in contrast to the H-2B regulations, the H-2A regulations conspicuously omit any reference to labor unions. Instead, the comparable subsection merely prohibits discrimination against anyone who "[c]onsulted with an employee of a legal assistance program or an attorney." 20 C.F.R. § 655.135(h)(4). Relatedly, both the H-2A and the H-2B regulations provide that "The employer must make all deductions from the worker's paycheck required by law." 20 C.F.R. § 655.122(p)(1); 20 C.F.R. § 655.20(c). The H-2B regulations, however, specifically authorize deductions of amounts "which are authorized by a collective bargaining agreement with bona fide representatives of workers which covers the employer." 20 C.F.R. § 655.20(c). No such provision appears in the H-2A regulations.

77.     Unlike H-2B workers and other classifications of immigrants and nonimmigrants, H-2A workers uniquely work pursuant to a binding work contract, and employers may be held liable for breach of this work contract. *See, e.g.*,  *Garcia-Celestino v. Ruiz Harvesting, Inc.*, 898 F.3d 1110, 1118 (11th Cir. 2018) ("As we have noted, the contracts at the center of Plaintiffs' breach-of-contract claims are Plaintiffs' clearance orders issued under the H-2A visa program, which, in turn, require compliance with the H-2A statutory and regulatory framework.").

78.     H-2A visa-holding guestworkers may only fill the jobs described in the sponsoring employer's approved clearance order and, upon completion of the work period described in the clearance order, or the worker's termination, whichever occurs first, the worker is required to return to his home country.

79.     Under the H-2A program, if the U.S. DOL finds that a participating employer violated a material term of its certification or improperly rejected U.S. workers for employment, the employer may be debarred from receiving future labor certifications. *See* 20 C.F.R. § 655.182(a), (d)(1)(iii).

80.     The U.S. DOL administers complaint proceedings unique to H-2A workers, where any H-2A worker can submit a confidential grievance that will be investigated. If this investigation reveals that a violation has occurred, the employer may be subject to civil money penalties, injunctive relief, and/or any additional remedies necessary to make the employee whole. 29 C.F.R. § 501.16.

81.     The U.S. Department of Justice also strictly enforces the program requirements. "Such enforcement includes the work contract provisions." 29 C.F.R. § 501.15. Employers who violate the work contract may face revocation of its labor certification, as well as civil or criminal penalties. *See* 29 CFR § 501.4; 29 CFR § 501.16; 8 U.S.C. § 1188(g)(2).

82.     Under Section 218 of the INA, the Secretary of Labor is authorized to impose specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment of the work contracts. 8 U.S.C. § 1188(g)(2). *See also* 8 C.F.R. § 214.2(h)(5)(vi)(A) ("In filing an H-2A petition, a petitioner and each employer consents to allow access to the site by DHS officers where the labor  is being performed for the purpose of determining compliance with H-2A requirements").

83.     The U.S. DOL can also initiate proceedings for "the recovery of unpaid wages," as well as "reinstatement and make whole relief for any U.S. worker who has been improperly rejected for employment, or improperly laid off or displaced" 29 C.F.R. § 501.16(a)(1).

84.     Agricultural employers participating in the H-2A program can be fined $20,439 per violation per worker "for laying off or displacing any U.S. worker employed in work or activities that are encompassed by the approved Application for Temporary Employment Certification for H-2A workers in the area of intended employment either within 60 calendar days preceding the first date of need or during the validity period of the job order." 29 C.F.R. § 501.19(e).

85.     For "each willful violation of the work contract," an H-2A employer can be fined $6,881. 29 C.F.R. § 501.19(c)(1).   In the case of "a willful violation of a housing or transportation safety and health provision of the work contract" that causes "death or serious injury of any worker," the employer can be fined $136,258 per worker. 29 C.F.R. § 501.19(c)(3).

86.     At all times while participating in the H-2A program, a farm must provide H-2A workers (and all domestic workers in corresponding employment) the wages and benefits as required by the U.S. DOL. Specifically, most participating employers—including the Farm Plaintiffs here—must pay workers the AEWR hourly rate (which, in New York and most states, is higher than the minimum wage). These provisions are designed to further the purpose of the H-2A program and ensure that the employment of temporary foreign contract workers does not adversely affect the employment of similarly situated domestic workers.

87.     The AgJOBS Act has been introduced in Congress, including in 2003. This bill would have allowed collective bargaining agreements to supersede H-2A work contracts. The bill never passed in Congress and has <u>not</u> become law.[5]

88.     In 2022, the United Farm Workers ("UFW")—the only labor union operating in New York that has petitioned for certification of units of H-2A employees—mounted a lobbying campaign, including through letters and meetings with federal agency officials, to change the H-2A regulations to allow collective bargaining of H-2A workers.[6] The changes proposed by UFW were

---

[5] The full title of the bill was the Agricultural Job Opportunity, Benefits, and Security Act of 2003. Its text can be found here: https://www.congress.gov/bill/108th-congress/senate-bill/1645/text?r=4&s=1. *See also* Philip Martin, *AgJOBS: New Solution or New Problems*, 37 INT'l MIGRATION REV. 1282 (2003) (explaining how, under the proposed—but never enacted—legislation, "H-2A provisions could be superseded by a collective bargaining agreement.").

[6] In one of the more recent exchanges, on April 21, 2022, UFW wrote a letter to Secretaries Mayorkas and Walsh specifically recommending new regulations governing "collective bargaining agreements for H-2A employers." *See*

not included in the H-2A regulations, which were last revised by a final rule published by the Department of Labor in November 2022.[7]

**NYSVGA**

89.    Upon information and belief, the member farms of NYSVGA face credible threat of prosecution because they intend to engage in speech that could be construed as "discouraging union organization," such as sending communications or handouts to their workers. NYSVGA's members rely on the H-2A program and are unsure if they can continue to use the program consistent with their past practice in light of the FLFLPA. NYSVGA and its members have no notice of any specific terms or conditions that might be imposed on them through a state-ordered collective bargaining agreement ("CBA") as part of the impasse arbitration process. NYSVGA has members who, at any time, can receive a Petition for Certification and be compelled to respond and eventually bargain with a labor union, without appropriate due process.

**Crist Bros Orchards**

90.    Upon information and belief, in March 2022, a prospective Crist Bros seasonal worker in Queretaro, Mexico received a phone call from a woman to discuss employment with Crist Bros. Upon information and belief, per the woman's request, the worker helped coordinate a meeting of ten to 15 future Crist Bros workers in the town of Queretaro. Upon information and

---

https://www.uscis.gov/sites/default/files/document/foia/H-2A_workers-Kashkooli.pdf, page 7. On May 26, 2022, UFW received a response on behalf of Secretary Mayorkas which confirmed receipt and advised that the agency "is actively considering potential reforms in the H-2A program." The response letter further recounts that the DHS Director personally held a meeting with the President of UFW on March 28 of last year. Congress also held hearings on the issue on July 20, 2022. UFW President's testimony to Congress asked for changes to the H-2A statute to provide    for    collective    bargaining,    but    Congress    declined    to    do    so.    *See* https://docs.house.gov/Committee/Calendar/ByEvent.aspx?EventID=115013.

[7] *See* Final Rule, *Temporary Agricultural Employment of H-2A Nonimmigrants in the United States*, 87 FR 61660 (effective November 14, 2022).

belief, these ten to 15 individuals intended to travel to New York and temporarily work for Crist

Bros for the 2022 harvest season. Upon information and belief, they thought that this meeting was

with Crist Bros, but it turns out that the woman was a union organizer with the United Farm

Workers ("UFW").

91.     Upon information and belief, on or about July or August 2022, a group of

prospective Crist Bros H-2A workers were staying at the Los Lirios hotel in the border town of

Matamoras, Mexico, waiting to see if they would be allowed to cross the border into the United

States under H-2A visas to go work for Crist Bros. Upon information and belief, UFW organizer

Isabel Egas arrived at this hotel and asked a hotel employee to knock on all the doors and inform

occupants that they need to come attend a "Crist Bros meeting." Upon information and belief, the

workers thought the meeting was either organized by Crist Bros or it was a part of the immigration

process (none of these workers had been approved for visas at this point). Upon information and

belief, workers were told to sign a list as they entered the meeting room. Only after signing in, it

became clear that the meeting was actually led by UFW organizers Isabel Egas and Armando

Elenes. Upon information and belief, Egas and Elenes presented these prospective workers with

union dues deduction authorization cards and aggressively pressed workers to sign the cards. Egas

guaranteed these workers permanent employment in exchange for signing union cards. This entire

interaction occurred in Mexico, before the workers had even been granted entry in the United

States or began their H-2A term of employment with Crist Bros.

92.     UFW filed a Petition with PERB on October 21, 2022. The Petition was signed by

Isabel Egas. In the Petition, UFW stated that it sought to represent a bargaining unit of "all

agricultural employees" of Crist Bros, a total of 120 employees. UFW also stated, "There is no

question or controversy. Employees have chosen to be represented by the United Farm Workers."
(**Exhibit 4**.)

93.     On October 25, 2022, Defendant Sarah Coleman sent a letter to Crist Bros enclosing

a copy of the UFW Petition and a Notice of Petition.  (**Exhibit 5**.)  The Notice of Petition directed

Crist Bros to submit various records and documents to PERB within ten working days—including

a list of employees and job titles, a written response to the Petition, and an offer of proof with a

sworn statement by a person with personal knowledge. Per the Notice, the Offer of Proof that Crist

Bros was required to submit was required to "set forth the specific facts that [Crist Bros] would

present at a hearing in support of any objections to the petition raised in its Response to the

Petition." The Offer of Proof was also required to contain the names of witnesses that will testify

at the hearing and "details of who the witness is and what the witness would testify to."  The letter

and Notice from PERB did not state the consequences of not responding or not complying with

the short ten-day deadline.

94.     Upon receipt of this letter and Notice of Petition from Sarah Coleman, Crist Bros

retained labor counsel and began preparing a response.

95.     During this time, after learning that there was a petition to unionize and that they

had apparently already "voted," several workers voluntarily provided Crist Bros managers and

owners with detailed accounts of the coercive behavior of UFW organizers in Mexico that caused

the workers to feel pressured into signing cards. Workers also told Crist Bros that they had no

interest in being associated with UFW, and that they did not know that signing a UFW card meant

joining a labor union.

96.     On November 14, 2022, after being granted a short extension upon request from

counsel, Crist Bros timely filed a 28-page Response to the Petition asserting numerous legal

arguments and objections to the Petition and an Offer of Proof including four separate exhibits. (**Exhibit 6.**)

97.     As part of its responsive filings, Crist Bros requested dismissal of the Petition. In the alternative, Crist Bros requested 1) a hearing; 2) an opportunity to view the evidence submitted by UFW in support of the Petition; 3) an opportunity to provide signature exemplars for workers who claimed that UFW had threatened to forge their signatures on the dues deduction cards (based on the fact that they signed a sheet when they arrived at the meetings) without their consent, so that PERB could compare the signatures and investigate whether any cards were fraudulent or forged; and 4) if necessary, a secret ballot election to allow workers to vote on union representation. (Ex. 6.)

98.     As part of its Offer of Proof, Crist Bros provided 10 statements from workers detailing the questionable tactics of UFW organizers and expressing their desire to revoke any dues deduction cards that may have been fraudulently signed in their name. (Ex. 6, pp. 51-76.) Crist Bros also provided copies of the 2022 H-2A Clearance Orders approved by the U.S. DOL and containing the terms and conditions of the work contracts between Crist Bros and its H-2A workers. Crist Bros also listed additional evidence that it was ready and willing to present at a hearing, including live testimony of workers and video recordings taken by workers during the meetings conducted by UFW organizers in Mexico. (Ex. 6, pp. 29-31.)  The workers' names were not provided because they had expressed fear of retaliation from UFW.

99.     Crist Bros also contested the number of employees in the unit of "all agricultural employees" included on the petition, which appeared to exclude a large number of agricultural workers.

100.    In response to the evidence and legal arguments submitted by Crist Bros, Sarah Coleman emailed counsel for Crist Bros and counsel for UFW and advised, "I need to conduct an investigation to determine the proper size of the bargaining unit.  At this point, this is the only issue I am addressing."

101.    Thereafter, at the direction and per the instructions of Sarah Coleman, the parties (UFW and Crist Bros, and their respective counsel) engaged in a multi-month process of emails and phone conferences with Coleman regarding the appropriate bargaining unit. As part of this process, PERB propounded burdensome document requests on Crist Bros and asked Crist Bros to reveal private personal information regarding its H-2A workers. PERB continued to ignore the legal arguments made by Crist Bros in support of dismissing the Petition. PERB likewise refused to address the evidence Crist provided in support of its argument that UFW had obtained signatures on dues authorization cards through fraudulent means or that the signatures and dates were not authentic. PERB also failed to respond to workers' direct calls.

102.    At the same time, in November 2022, UFW filed an unfair labor practice charge against Crist Bros alleging that supervisors "threatened employees to terminate them if they refused to sign an anti-union petition in violation of the law." To date, UFW has never produced a copy of this alleged "anti-union petition" that it claims was circulated by Crist Bros despite that Coleman instructed them that failure to provide such evidence would be an "evidentiary issue"— no such document exists. UFW asserted the Charge was brought under SERA § 704-b(2)(c), which makes it unlawful for an employer to "discourage union organization." (**Exhibit 7**.) In a letter to the parties, Defendant Coleman confirmed that this statutory provision was a proper ground to bring a charge and that the Charge would be processed by the agency. Crist Bros filed Motions

and an Answer in response to that Charge. PERB did not grant Crist Bros's request to dismiss the Charge.

103.    By the end of November 2022, the H-2A workers' contract had ended, and they were no longer under contract at Crist Bros and had returned home with no legal expectation of return. Crist Bros noted this fact in its Response to the Petition and in emails to Sarah Coleman and the Union. Crist Bros also produced the H-2A work contracts as evidence of the dates of temporary employment.

104.    On December 5, 2022, Defendant Coleman emailed the parties to advise of a conference scheduled for December 12 to "discuss both the improper practice charge and the pending certification." Coleman also asked if Crist Bros would like to present its video evidence as part of the conference.

105.    The operative regulation at the time, PERB Rule 253.46, provided that "No testimony or evidence shall be given or received at any hearing concerning transactions had or statements or communications made during the conduct or course of any informal conference called and held concerning charges or petitions unless at the hearing all parties shall expressly waive this provision."

106.    On December 6, 2022, in response to Sarah Coleman's email, counsel for Crist Bros replied, "The employer does not intend to submit any video evidence at the informal conference. The employer identified transcripts of video interviews and a video of a union meeting with workers in its offer of proof and indicated that it would be presenting this evidence at the requested hearing in this case. My understanding is that Monday's meeting is an informal conference to try to narrow the scope of the outstanding issues in the cases. Based on the procedural rules, the case could then be assigned to an ALJ who would consider the evidence and

conduct a hearing.  I was not under the impression that we would be presenting evidence at the informal conference. Please let me know if I have misunderstood the process."

107.    On December 7, 2022, Coleman responded, "Your understanding of the process is correct – that is, we will be holding an informal conference first, and then proceeding to a hearing as necessary." (**Exhibit 8.**)

108.    As part of the same December 7 email, Coleman also informed the parties that she "will also be serving as the ALJ in this matter." (Ex. 8.)

109.    Coleman then directed the parties to submit supplemental briefs and legal arguments regarding whether H-2A workers whose work contracts have ended are eligible to be counted as part of the showing of interest and eligible to be included in bargaining unit.

110.    In its January 6, 2023 Supplemental Brief, Crist Bros advanced numerous detailed reasons for why the H-2A program is incompatible with SERA. Crist Bros also reminded PERB of the undisputed fact that all of the H-2A workers that UFW had sought to represent were no longer employed by Crist Bros—as a matter of law, and as required under the H-2A regulations, they were no longer eligible to work for Crist Bros, or at all in the United States; rather, they were obligated to return to their home countries and they had no legal right or expectation of offered another work contract by Crist Bros. Lastly, Crist Bros used its Supplemental Brief to reiterate that it had submitted evidence regarding the validity of UFW's showing of interest (the prerequisite to certification), and Crist Bros likewise reiterated that the evidence should be considered as it may require dismissal of the Petition.

111.    Separately, Coleman directed the parties to reach a stipulation of facts regarding the working conditions of workers in the packing house and orchards to determine whether they should all be included in the proposed unit.

112.    At Coleman's direction, the parties spent months investigating and debating the differences between Crist Bros's "packing house" workers and its "apple orchard" workers. The ostensible purpose of this exercise was to assist Coleman with deciding whether to grant UFW's request to *prevent* packing house workers from joining the bargaining unit. Although Crist Bros was served with a Petition alleging that UFW sought a unit of "all agricultural workers," and the Petition was never amended, Coleman entertained UFW's new theory for excluding packing house workers from a showing of interest. UFW contended that workers who performed most of their work in the packing house did not share a sufficient community of interest with workers who performed most of their work outdoors.  Under traditional labor law principles, an appropriate bargaining unit for election and representation purposes includes workers who share similar working conditions and thus community of interest. Coleman exhausted the parties' and the agency's resources on this issue instead of addressing Crist Bros's dispositive legal arguments regarding H-2A preemption. While reserving all rights to assert those legal arguments, Crist Bros explained that its so-called "packing house workers" and "orchard workers" are actually one cohesive group of workers, with overlapping job duties and responsibilities, who work together as part of the farm's integrated operations. Crist Bros also highlighted the language from one of the H-2A work contracts, which included both packing and outdoor orchard work as part of the job duties of the same group of workers.

113.    UFW also argued that the packing house workers should be excluded because they were engaged in a commercial packing operation and opposed to agriculture, which would subject them to the NLRA as opposed to SERA.

114.    The parties eventually reached a stipulation of facts that was narrowly limited to only cover "the issue of whether the domestic and H-2A packing house workers should be included

in the petitioned for unit along with the domestic and H-2A apple orchard workers." Counsel for Crist Bros and UFW signed the stipulation on March 15 and March 16, 2023, respectively.

115.    After more deliberations and the submissions of additional supplemental briefs regarding the community of interest issue, pursuant to Coleman's request, PERB finally issued a written decision.

116.    The Hearing Officer's Interim Decision, issued on April 10, 2023 by Sarah Coleman, held, among other things, 1) "that a unit including both apple orchard and packing employees is the appropriate one;" 2) that the union "submitted a showing of interest of at least 30% of employees in the proposed unit, which means that a secret-ballot election may be appropriate;" and 3) that PERB was "not yet ordering an election, as it remains to be seen whether any of Crist's arguments against certification (such as whether H-2A workers are not eligible for inclusion in a unit) would also bar an election." (**Exhibit 9.**)  Finally, Coleman advised that she "shall continue processing this matter and shall issue a decision on the remaining issues at the earliest possible date." No further decision was issued for more than four months thereafter, despite Crist Bros continuing to request a decision and a dismissal of the Petition based on its legal and factual arguments.

117.    On September 21, 2023, a Decision of Hearing Officer and Direction of Election was issued by Mariam Manichaikul.  In this decision, Manichaikul held that (1) H-2A workers and seasonal employees are not barred from inclusion in the petitioned for unit and are eligible to vote in an election, (2) the 21 employees whose eligibility to vote has been questioned will be allowed to vote subject to challenge, (3) that an election will be held at the first possible date.  (**Exhibit 10**.)  PERB ordered Plaintiff Crist Bros to submit employee information to the agency "within ten working days." PERB ostensibly ordered this election because the union had submitted signed

cards from at least 30% of the bargaining unit employees, *see* PERB Rule § 263.22, however PERB declined to investigate Crist Bros's evidence that this alleged 30% showing of interest was proffered on the basis of outright fraudulent dues deduction authorization card signatures.

118.    Crist Bros' Motion to Dismiss the Unfair Labor Practice Charge filed by UFW on November 14, 2022, has not been adjudicated, and no hearing has been held.

119.    PERB continues to prosecute the unfair labor practice charge against Crist Bros. The Charge alleges violations of SERA § 704-b(2)(c), which makes it unlawful for an agricultural employer to either "discourage union organization" generally or "discourage an employee" from engaging in union-related activities.

120.    Crist Bros' fruit growing operations are currently in peak season, and Defendants' ongoing and threatened enforcement actions threaten to disrupt farming operations, crop yields, customer relationships, and employee relationships and goodwill.

121.    Crist Bros has a credible fear of prosecution for engaging in lawful and constitutional speech, including expressing opinions that could be construed as "discouraging union organization."

122.    Crist Bros has a credible fear of prosecution from State authorities for complying with federal law and the requirements of the H-2A program. Specifically, some of Crist Bros' current H-2A work contracts are set to end within two months, one is ending on October 16, 2023, and the workers are returning home on October 8, 2023, and federal law requires Crist Bros to permanently discharge H-2A workers when their contractual term of employment ends. Crist Bros fears the threat of having to answer unfair labor practice charges for permanently discharging these workers without providing them a right to "recall," and they cannot provide H-2A workers any "recall" rights without violating H-2A regulations.

123.    Crist Bros intends to operate their farms free from unconstitutional targeted interference by the State.

**Porpiglia Farms**

124.    On October 25, 2022, Porpiglia Farms received a Notice of Petition in the mail from PERB, along with an enclosed copy of a Petition for Representation that UFW had submitted to PERB. The Petition sought to represent "all agricultural employers" and stated "there is no question or controversy. Employees have chosen to be represented by the United Farm Workers."

125.    Similar to Crist Bros, Porpiglia responded with a comprehensive Response and Offer of Proof. Porpiglia submitted these documents to PERB on November 14, 2022.

126.    Like in the Crist Bros matter, Defendant Sarah Coleman was the Administrative Law Judge. At all relevant times until July 2023, Porpiglia made all submissions to Defendant Coleman, and she was Porpiglia's primary point of contact for all aspects of the agency's investigation, administration, and adjudication of all issues involving Porpiglia.

127.    Porpiglia's Response to the Petition included a detailed multi-part legal argument asserting that the union's showing of interest in support of its Petition—based on the numbers of employees listed on the Petition—could only have been composed of temporary guestworkers on H-2A visas, not permanent or domestic seasonal employees. Porpiglia explained that the H-2A regulations and work contracts preempt New York labor with respect to these workers. Porpiglia also explained that, even under traditional labor law principles, temporary contract workers with a finite end date of employment and no expectation of continued or permanent employment cannot be eligible to vote for unionizing a workplace and cannot be included in a permanent bargaining unit.

128.     With its Offer of Proof, Porpiglia listed the evidence that it intended to submit at a hearing. Consistent with its understanding of SERA and PERB Rules, Porpiglia anticipated that a hearing would be held because Porpiglia had alleged a question or controversy regarding representation. At the same time, Porpiglia submitted documentary evidence as part of its Offer of Proof, including sworn affidavits, as well as copies of its H-2A work contracts. Porpiglia also submitted evidence showing that the current terms of employment of all its H-2A workers, pursuant to the work contracts, will end on November 25, 2022.

129.     Porpiglia also made PERB aware that "More than 40 employees have voluntarily informed management that they were misled and coerced into signing cards, they did not know what the cards meant, and they do not want to join a union. Porpiglia will submit evidence and testimony from these employees, including detailed handwritten statements confirming they do not want union representation."

130.     On November 21, 2022, Porpiglia received notice that UFW had filed an unfair labor practice charge alleging that Porpiglia "threatened employees to terminate them if they refused to sign an anti-union petition in violation of the law." (**Exhibit 11**, p. 4)  The Charge did not attach a copy of this alleged anti-union petition, nor could it have, because such document does not exist. The Charge also did not list the names of the employees who allegedly were threatened, even though PERB Rules require listing the names of the employees as part of the Charge.

131.     PERB did not dismiss the Charge or hold a hearing. Rather, Defendant Sarah Coleman held a conference with the parties where she advised that she planned to process the Charge after the Union files a Charge Supplementation with more specific allegations and the specific statutory grounds for the unfair labor practice.

132.     The Union submitted a Charge Supplementation on January 6, 2023. The Charge Supplementation against Porpiglia alleged an unfair labor practice under SERA § 704-b(2)(c), which states it "shall be an unfair labor practice for an agricultural employer to . . . discourage union organization or to discourage an employee from participating in a union organizing drive, engaging in protected concerted activity, or otherwise exercising the rights guaranteed under this article." However, the Charge and Charge Supplementation did not state which specific provision of the statute Porpiglia allegedly violated.

133.     Likewise, the Union's Charge and Charge Supplementation enclosed zero documents, zero affidavits, and zero names of workers with firsthand knowledge of its allegations.

134.     On January 23, 2023, Porpiglia filed an Answer to the Charge and requested dismissal of the Charge based on a number of legal and factual bases. (**Exhibit 12.**)  As part of its Answer, Porpiglia attached affidavits and evidence, including signed declarations from H-2A workers, which conclusively disproved the Union's allegations.

135.     PERB declined to dismiss the Charge.

136.     On February 15, 2023, PERB began enforcing new and revised rules, which governed the substantive and procedural rights of the parties. Porpiglia received no guidance to what extent these new rules would apply to pending petitions and unfair labor charges that had been filed prior to the enactment of the new rules.

137.     On February 28, 2023, Defendant Sarah Coleman held a Conference with counsel for UFW and counsel for Porpiglia. During this Conference, she informed the parties that she intended to hold a hearing on both the certification issues and the unfair labor practice charge issues. (No hearing was ever held on either issue).

138. Defendant Coleman also asked the parties to reach a stipulation of facts regarding the terms and conditions of employment of the packing house workers and apple orchard workers, for the ostensible purpose of determining whether these workers share a community of interest and should be included in the same bargaining unit.

139. UFW did not want any of Porpiglia's H-2A workers who primarily work in the packing house to be included as part of their showing of interest or included in the bargaining unit. Likewise, at all times, UFW refused to agree to a secret ballot election administered by PERB. And PERB refused to administer an election.

140. At all times, and at each possible opportunity, Porpiglia reminded Defendant Coleman and PERB of its dispositive legal arguments that needed to be addressed—including the preemption of this Petition by the federal H-2A regulations, and the fact that the H-2A workers were no longer employed by Porpiglia and had returned to their home countries.

141. The parties eventually agreed on terms of a stipulation, which incorporated the H-2A work contracts.

142. On March 21, 2023, Sarah Coleman emailed the parties with her distillation of the issues in the case. She listed the issues as "(1) whether H-2A workers should be excluded from collective bargaining altogether and should not be placed in any unit; (2) whether workers present on H-2A Visas who have returned to their home countries are employees that should be included in the proposed unit; (3) the effect of the employee statements submitted by the Employer; (4) whether packing employees and field workers have distinct communities of interest and should not be included in the same unit; (5) whether packing employees are engaged in a commercial enterprise such that they should not be considered agricultural workers."

143. The parties were provided an opportunity to submit supplemental briefs to advance legal arguments on these issues, but the parties were not provided with an opportunity to submit evidence. Despite Porpiglia's requests, no hearing was held.

144. Defendant Coleman's March 21, 2023 distillation of the issues did not include the issue of the fraud and coercion alleged by Porpiglia in its Response to the Petition and Offer of Proof, which Porpiglia had at all times intended to prove at a hearing where it could submit its evidence, including live testimony.

145. Among other things, Porpiglia's Response to the Petition and Offer of Proof had advised PERB of the following issues and accompanying requests:

   a. "Porpiglia and its counsel has evidence of UFW engaging in a pattern of forging signature cards to support its Petitions, both in this case and in other farm labor cases currently pending before PERB Accordingly, Porpiglia requests signature exemplars to further ascertain whether any signatures may have been forged by the Union."

   b. "In addition to signature exemplars, PERB should investigate the authenticity of the signatures."

   c. "The Board's investigation should address employee literacy and comprehension. To the extent any purported signatory could not understand the implications of their signature, their cards cannot reliably indicate an intent to be represented. For instance, many of the employees do not speak or understand English. Porpiglia will also introduce evidence that employees did not or could not read the cards, and the Union failed to adequately translate or explain the significance of a signature."

146.    Each of these requests was supported by authority from federal labor law, which PERB's prior decisions had advised would be considered persuasive on any issue where—as here—there are no governing or contradictory PERB regulations. *See Renaissance Hotel Assocs.*, No. ES 20-CA-22753, 1992 WL 1465621 (Sept. 22, 1992) ("It is established Board law that signatures on authorization cards may be duly authenticated by handwriting experts."); NLRB General Counsel Memorandum, GC 15-08 (Sept. 15, 2015) ("the Board's procedures provide recourse for parties to submit evidence impugning the validity of the showing of interest and, by this means, to secure dismissal of the petition if the Board, after its administrative investigation, concludes that the showing of interest is of questionable authenticity."); *Highland Yarn Mills, Inc.*, 313 NLRB 193 (1993) ("the burden of proof to show that a card is valid rests squarely upon the one who has proffered a card as a basis for asserting majority status.").

147.    On April 12, 2023, Defendant Sarah Coleman issued a written decision certifying a bargaining unit and ordering Porpiglia to bargain with UFW. *See United Farm Workers v. Porpiglia Farms*, CU-6695, 56 PERB ¶ 4406, 2023 WL 3963573 (April 12, 2023).

148.    Under PERB Rule § 263.29, "The certification issued by the hearing officer shall be final and binding and the obligation to bargain shall attach."

149.    The binding April 12 Decision held "that application of the SERA to H-2A workers is not preempted by the Immigration and Nationality Act (INA) or its associated regulations." The Decision was grounded on a number of demonstrably incorrect conclusions of law, including determinations that 1) "the federal government has not set forth a comprehensive statute governing the collective bargaining rights of nonimmigrant workers;" 2) "The INA does not set forth the terms and conditions of employment for H-2A workers;" 3) certifying a bargaining unit of exclusively H-2A workers under SERA "does not interfere with the purpose and objectives that

the federal government set forth in the INA;" and 4) "While employers must submit terms and conditions of employment for H-2A workers to the Department of Labor (DOL) for approval, the specific terms and conditions are not mandated by the DOL."

150.   The binding April 12 Decision also ruled "That employees may have changed their minds about signing a card is not a reason to allow employees' to revoke their authorization for the UFW to serve as their collective bargaining representative. These authorizations serve as the functional equivalent of a vote and are not to be lightly set aside."

151.   The binding April 12 Decision also held that the bargaining unit (and the total number of employees against which a majority showing of interest should be determined) should only include "apple orchard workers" and should *not* include so-called packing house workers, even though the packing house workers "spend approximately 40 percent of their annual work time performing apple orchard work."

152.   This holding regarding packing house workers was in direct contradiction to the decision issued by Defendant Coleman in the Crist Bros matter, where she reached the opposite result under a nearly identical set of facts. The two decisions cannot be reconciled.

153.   The Decision also held that Porpiglia was not entitled to a hearing and denied Porpiglia's requests to present evidence. All of Porpiglia's legal and factual arguments were denied.

154.   Within a week after the Decision, Porpiglia received a comprehensive, multi-part request for information from UFW. The Union demanded that Porpiglia provide detailed information and records regarding the farm's operations, practices, products, and customers. The Union also demanded personal identifiable information regarding Porpiglia's current employees and contract laborers.

155.    When Defendant Sarah Coleman sent a copy of this Decision to counsel via email on April 12, 2023, she stated that "[t]he time for filing exceptions starts upon receipt of the hard copy." Other correspondence between counsel and PERB similarly refers to "exceptions." The April 12 email from Coleman also attached a document titled "Exceptions document for FLFLPA Certifications." That document directs the parties to comply with PERB Rules §263.28 and §263.29. Neither of those Rules, however, speak to "exceptions." Rather, exceptions are governed by PERB Rule §263.67 ("Exceptions to the Board"). PERB did not provide any guidance regarding the relationship between these Rules and their applicability. Faced with these seemingly conflicting rules and imprecise nomenclature, counsel for Porpiglia was unable to discern which set of rules and deadlines governed its ability to appeal the Decision, and Porpiglia made its best efforts to comply with its interpretation of the rules in good faith.

156.    Porpiglia submitted an appeal to PERB on May 2, 2023, which included—in light of the conflicting procedural rules—three separate documents: Exceptions to the Hearing Officer's Decision, Objections to Certification, and a Brief in Support of its Exceptions.

157.    At the same time, on May 2, 2023, Porpiglia submitted a Motion to Stay the Certification and Order to Negotiate until such time as the Board has rendered a final decision on Porpiglia's appeal.

158.    PERB took no action on the Motion to Stay at any time in May 2023.

159.    On May 17, 2023, the PERB invited parties and amici to submit briefs regarding the issues of H-2A preemption and whether non-employees could be included in bargaining units. PERB set a deadline of June 28, 2023 for parties or amici to file briefs, and a separate deadline of July 31, 2023 for the parties to file responsive briefs. PERB continued to enforce the bargaining and certification orders during this entire time period and continues to do so today.

160.    On May 25, 2023, UFW filed an unfair labor practice charge against Porpiglia pursuant to SERA § 704(6), and on the basis that Porpiglia had allegedly refused to bargain collectively. Porpiglia received notice of this Charge on May 31, 2023, along with a Notice of Conference from PERB.

161.    On June 2, 2023, UFW filed a Declaration of Impasse pursuant to SERA § 702-b.

162.    On June 8, 2023, Porpiglia filed an Answer to the Declaration of Impasse, in which it pointed out that "the Parties have not yet begun any negotiations because the Certification Order has been appealed to the Board, the Employer's Motion for Stay of Certification remains pending before the Board, and the Board has set a briefing schedule for the parties and amici to provide briefing on multiple threshold dispositive issues."

163.    PERB continues to enforce the April 12 Certification and Order to Negotiate. PERB took no action on Porpiglia's Motion to Stay until June 14, 2023, when PERB General Counsel Michael T. Fois sent a letter to the parties *denying* the Motion to Stay.  (**Exhibit 13.**)

164.    On June 28, 2023, PERB Director of Conciliation William M. Conley sent a letter to counsel for Porpiglia stating, "I hereby deem an impasse to exist and find it appropriate that a mediator be assigned." PERB appointed mediator Lori Matles, an employee of the State of New York, to direct bargaining negotiations between Porpiglia and UFW. (**Exhibit 14.**) [8]

165.    On July 10, 2023, PERB notified the parties that Mariam Manichaikul would be replacing Sarah Coleman as the Director of PERB's Office of Private Employment Practices and Representation, and that Manichaikul would also take over processing and adjudicating all pending representation and unfair labor charge matters.

---

[8] The enclosed "Appointment of Mediator" letter (Ex. 14, p. 3) was incorrectly dated October 1, 2023. Porpiglia, in fact, received these documents simultaneously, on June 28, 2023.

166.    On August 4, 2023, UFW filed an unfair labor practice charge against Porpiglia (Charge No. UP-39036), alleging that Porpiglia had violated SERA § 704-b(2)(c) by "discouraging workers from participating in a union organizing drive by not recalling H-2A workers," and alleging that Porpiglia had violated SERA § 704(6) by a "change in the timing, hiring, and recall of H-2A workers without notifying and bargaining with the Union." (**Exhibit 15.**)

167.    As part of its August 4 Charge, UFW requested "an immediate recall of the affected workers and that said workers be made whole with back pay and other benefits."

168.    Porpiglia answered this Charge by highlighting its obligations to comply with federal law and the requirements of the H-2A program. Porpiglia requested dismissal of the Charge because requiring a farm to "recall" (in reality, re-hire) former H-2A workers who have not entered into new work contracts with Porpiglia would expressly require Porpiglia to violate federal regulations, which could lead to the farm being debarred from the H-2A program and thus ineligible to hire any H-2A workers, as well potential civil and criminal penalties. (**Exhibit 16.**)

169.    Moreover, the Union, through its unfair labor practice charge, was requesting that Porpiglia immediately re-hire former H-2A workers who were not in the United States and had no legal authorization to enter the country, as well as former H-2A workers who had absconded during their prior term of employment and thus are ineligible to enter into new H-2A work contracts. *See* 8 C.F.R. § 214.2(h)(5)(viii).

170.    Although the H-2A regulations themselves allow workers to receive reinstatement and back pay if the U.S. DOL orders such relief, states cannot do so. And back pay awards to employees who have no legal right to work in the country during the time period for which back pay is sought have been curtailed by the U.S. Supreme Court on preemption grounds. *See Hoffman Plastic Compounds, Inc. v. N.L.R.B.*, 535 U.S. 137, 151–52 (2002) (holding that such backpay

awards "would unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA," and that "[h]owever broad the Board's discretion to fashion remedies when dealing only with the NLRA, it is not so unbounded as to authorize this sort of an award."). Porpiglia cited to this statement of law as part of its Answer to the Charge.

171.    On August 24, 2023, along with its Answer to the Charge (as required by PERB Rules), Porpiglia filed a Motion to Dismiss Charge UP-39036. (Ex. 16, pp. 11-18.) Porpiglia cited to the above-referenced authorities and asked PERB to dismiss the Charge because PERB has no power to order Porpiglia to "recall" former H-2A workers, and because Porpiglia actually has an affirmative duty to *not* re-hire H-2A workers if qualified domestic workers are available. *See* 20 CFR § 655.135(c).  PERB declined to dismiss the Charge.

172.    Instead of dismissing the Charge, Defendant Manichaikul prosecuted the Charge by ordering the parties to attend a conference on August 29, 2023. At the conference, Manichaikul advised that she would not dismiss the Charge on the basis of the legal arguments set forth by Porpiglia involving federal law preemption. Instead, the parties were directed to negotiate and attempt to resolve the charge through agreement. The Charge was placed "on hold until September 8, 2023." Thereafter, the parties did not resolve the Charge by that date, and Defendant Manichaikul then advised that she will continue processing the Charge.

173.    PERB continues to prosecute unfair labor charges against Porpiglia, and PERB continues to order Porpiglia to bargain with the Union over the terms and conditions of H-2A workers, under the threat of binding impasse arbitration.

174.    Union negotiators have threatened to file for impasse arbitration against Porpiglia. At the first State-ordered mediation session, the union presented Porpiglia with a Proposed Collective Bargaining Agreement, which the mediator threatened could be imposed on Porpiglia

through the impasse arbitration process. (**Exhibit 17.**) The mediator advised the parties that the next mediation session should be held on October 12, 2023.

175.    Porpiglia's fruit growing operations are currently in peak season, and Defendants' ongoing and threatened enforcement actions threaten to disrupt farming operations, crop yields, customer relationships, and employee relationships and goodwill.

176.    Porpiglia has a credible fear of prosecution for engaging in lawful and constitutional speech, including expressing opinions that could be construed as "discouraging union organization."

177.    Plaintiffs has a credible fear of prosecution from State authorities for complying with federal law and the requirements of the H-2A program. Specifically, Porpiglia's current H-2A work contracts are set to end within two months, and federal law requires Porpiglia to permanently discharge H-2A workers when their contractual term of employment ends. Porpiglia fears the threat of having to answer unfair labor practice charges for permanently discharging these workers without providing them a right to "recall," and they cannot provide H-2A workers any "recall" rights without violating H-2A regulations.

178.    Porpiglia intends to operate their farms free from unconstitutional targeted interference by the State.

**A&J Kirby Farms**

179.    On October 24, 2022, UFW filed a Petition against Kirby Farms, seeking to certify a bargaining unit of "all agricultural employees" and stating that "there is no question or controversy."[9]

---

[9] Much of the procedural history of the Kirby matter mirrors the Porpiglia Farms matter. For purposes of efficiency and to avoid unnecessary redundancy, this section provides a more

180.    On November 16, 2022, Kirby submitted a Response to the Petition and an Offer of Proof enclosing evidence that UFW's dues deduction authorization cards had been obtained through fraud and coercion.

181.    Kirby requested the same relief as Porpiglia had requested, including a hearing and an opportunity to be heard and present its evidence. Kirby also requested dismissal of the Petition because its showing of interest was made on the basis of purported dues deduction cards signed by temporary H-2A workers whose terms and conditions of employment were already governed by binding H-2A work contracts, as required under federal law. Kirby also pointed out that these workers' period of employment was obligated to end by November 25, 2022, per the work contracts, and that Kirby would not be able to re-hire any of those workers again unless qualified domestic workers were unavailable, as determined by the federal government.

182.    Like the other farms, Kirby has faced numerous unfair labor practice charges by UFW, on similar grounds, that PERB has refused to dismiss and continues to prosecute.

183.    Kirby was denied the right to present its evidence at a hearing or before a neutral decisionmaker.

184.    At all relevant times from the filing of the Petition through a final ALJ decision being issued, Defendant Sarah Coleman acted as the administrative law judge, the investigator, and the sole PERB employee tasked to make decisions on any factual, legal, or procedural matter.

185.    On March 16, 2023, Defendant Coleman issued a binding decision, certification, and order to negotiate. *See United Farm Workers v A&J Kirby Farms*, CU-6696, 56 PERB ¶ 4402, 2023 WL 3071143 (March 16, 2023).

---

abbreviated procedural history. Plaintiffs Kirby, Porpiglia, Crist Bros, and Lynn-Ette each asserted the same or similar legal defenses and arguments regarding H-2A preemption.

186.    This March 16 Decision included numerous new conclusions and findings of law and fact that were contrary to established law and that were promulgated and applied to Kirby with no prior notice.

187.    Kirby filed an appeal to PERB.  **(Exhibit 18.)** As part of its appeal, Kirby put PERB on notice of numerous constitutional issues, including federal law preemption, as well as due process violations.  Kirby also filed a Motion to Stay the Decision and Certification, which was denied on the exact same basis as in the cases of the other Farm Plaintiffs. PERB has not yet issued a ruling on the appeal, but PERB continues to enforce the bargaining order against Kirby, as well as prosecuting the unfair labor charges.

188.    On June 28, 2023, PERB Director of Conciliation William M. Conley sent a letter to counsel for Kirby stating, "I hereby deem an impasse to exist and find it appropriate that a mediator be assigned." (This letter was substantially identical to the one issued to Plaintiff Porpiglia, *see* Ex. 14). PERB appointed mediator Greg Poland, an employee of the State of New York, to direct bargaining negotiations between Kirby and UFW.

189.    The parties participated in a remote bargaining session with Mediator Poland on August 15, 2023, at which time UFW submitted a proposal almost identical to the proposal submitted to Porpiglia.  Mediator Poland has asked the parties to provide available dates to direct an in-person bargaining session.

190.    Kirby's fruit and vegetable growing operations are currently in peak season, and Defendants' ongoing and threatened enforcement actions threaten to disrupt farming operations, crop yields, customer relationships, and employee relationships and goodwill.

191.    Kirby has a credible fear of prosecution for engaging in lawful and constitutional speech, including expressing opinions that could be construed as "discouraging union organization."

192.    Kirby has a credible fear of prosecution from State authorities for complying with federal law and the requirements of the H-2A program. Specifically, Kirby's current H-2A work contracts are set to end within two months, and federal law requires Kirby to permanently discharge H-2A workers when their contractual term of employment ends. Kirby fears the threat of having to answer unfair labor practice charges for permanently discharging these workers without providing them a right to "recall," and they cannot provide H-2A workers any "recall" rights without violating H-2A regulations.

193.    Kirby intends to operate their farms free from unconstitutional targeted interference by the State.

**Lynn-Ette & Sons**

194.    UFW filed a Petition with PERB on October 24, 2022. The Petition was signed by Sydney Collins. In the Petition, UFW stated that it sought to represent a bargaining unit of "all agricultural employees" of Lynn-Ette. UFW also stated, "There is no question or controversy. Employees have chosen to be represented by the United Farm Workers."

195.    On October 31, 2022, Defendant Sarah Coleman sent a letter to Lynn-Ette enclosing a copy of the UFW Petition and a Notice of Petition.  The Notice of Petition directed Lynn-Ette to submit various records and documents to PERB within ten working days—including a list of employees and job titles, a written response to the Petition, and an offer of proof with a sworn statement by a person with personal knowledge. Per the Notice, the Offer of Proof was required to "set forth the specific facts that [Lynn-Ette] would present at a hearing in support of

any objections to the petition raised in its Response to the Petition." The Offer of Proof was also required to contain the names of witnesses that will testify at the hearing and "details of who the witness is and what the witness would testify to."

196.     On November 16, 2022, Lynn-Ette timely filed a Response to the Petition asserting numerous legal arguments and objections to the Petition and enclosing various Exhibits. Included with the Response to the Petition was an alphabetized list of employees, that included Lynn-Ette's domestic workers and H-2A workers under contract at the time the Petition was filed.

197.     Although they were under contract with Lynn-Ette at the time the Petition was filed, by the end of November/December of 2022, the H-2A workers' work contract had ended, and they were no longer employed by Lynn-Ette. Lynn-Ette produced the H-2A work contracts as evidence of the dates of their temporary employment.

198.     On or about December 6, 2022, Acting Director Coleman held a conference with Lynn-Ette and UFW to discuss the scope of the unit and the issues raised in Lynn-Ette's Response.

199.     One of the objections the Employer raised in its response to the petition, related to the inclusion of H-2A guest workers in the bargaining unit.  Acting Director Coleman directed the parties to submit supplemental briefs and legal arguments regarding whether H-2A workers are eligible to be counted as part of the showing of interest and eligible to be included in the bargaining unit.

200.     On December 15, 2022, UFW filed an unfair labor practice charge with PERB, alleging that Lynn-Ette inappropriately interrogated and/or threatened to terminate and/or not recall employees who supported the union.   This matter has currently been placed on hold.

201.     On December 20, 2022, Lynn-Ette filed its brief and advanced numerous detailed reasons for why the H-2A program is incompatible with SERA. Lynn-Ette also reminded PERB

of the undisputed fact that all of the H-2A workers that UFW had sought to represent were no longer working for Lynn-Ette—as a matter of law, and as required under the H-2A regulations, they were no longer eligible to work for Lynn-Ette, or at all in the United States; rather, they were obligated to return to their home countries and they had no legal right or expectation of being re-hired by Lynn-Ette.

202.    Separately, Coleman directed the parties to reach a stipulation of facts related to the terms and conditions of employment for Lynn-Ette's domestic full-time, seasonal and H-2A guest workers.  Coleman requested such stipulation of facts so that she could determine whether there was a community of interest to include domestic full-time, domestic seasonal and H-2A guest workers in the same union.  A determination as to who was included in the union would directly impact her determination as to whether the Union had achieved majority status and was entitled to be certified as the exclusive bargaining representative without an election.

203.    The parties reached a stipulation of facts which was submitted to Coleman on March 13, 2023.

204.    On or about April 5, 2023, the parties submit supplemental briefs regarding whether there was a sufficient community of interest between its domestic full-time, domestic seasonal and H-2A guest workers to be included within the scope of the same bargaining unit.

205.    The Hearing Officer's Decision, issued on April 11, 2023 by Sarah Coleman held: 1) that H-2A workers were not precluded from being included within the scope of a collective bargaining unit or being counted towards a showing of interest, despite these workers not being permanent employees; 2) that federal law did not preempt SERA and the FLFLPA's coverage of H-2A workers; 3) that Lynn-Ette's domestic seasonal employees had a sufficient community of interest to be included in a bargaining unit with H-2A guest workers; 4) that Lynn-Ette's full-time

domestic workers did not share an adequate community of interest with the domestic seasonal and

H-2A employees to be included within the same unit as the domestic seasonal and H-2A guest

workers; 5) that cards signed by H-2A guest workers who were no longer employed by Lynn-Ette

could be counted and used by the Union to achieve majority representation; 6) that seasonal

domestic employees were included within the scope of the bargaining unit even though there were

no seasonal domestic employees employed by Lynn-Ette at the time the petition was filed, or at

the time Coleman's decision was rendered; 7) that although seasonal domestic employees were

included in the unit, they were not taken into consideration when determining whether the Union

had achieved  majority representation because no seasonal domestic employees were employed at

the time the Petition was filed or certified; and 8) that because the Union represented a majority of

the scope of the unit, the union was certified without an election and the parties are ordered to

negotiate. *United Farm Workers v. Lynn-Ette & Sons*, CU-6699, 56 PERB ¶ 4405, 2023 WL

3602764 (April 11, 2023).

206.     Thereafter, on May 5, 2023, Lynn-Ette filed an Appeal to PERB setting forth

multiple Exceptions to Coleman's April 11, 2023 Decision, along with a Memorandum of Law in

support of the Appeal.  In addition, pending the outcome of the Appeal, Lynn-Ette filed a Motion

to Stay Coleman's April 11, 2023 Order that directed the parties to negotiate.

207.     Without ever meeting or exchanging any proposals, On June 3, 2023, the Union

filed a Declaration of Impasse with PERB. PERB granted the Union's impasse request and ordered

the parties to mediation pursuant to SERA § 702-b.

208.     On the morning of June 14, 2023, because PERB had failed to render a decision on

its Motion for a Stay, Lynn-Ette filed a renewed Motion to Stay Coleman's April 11, 2023 Order

to Collectively Negotiate and a Notice of Motion to Stay the Union's Declaration of Impasse and Request for Appoint of a Mediator.

209.   On June 14, 2023, without a written decision, PERB summarily denied Lynn-Ette's Motion for a Stay.

210.   Lynn-Ette and the Union held their first mediation session on September 21, 2023. Lynn-Ette was presented with a contract proposal almost identical to that received by Porpiglia and Kirby. *See* Exhibit 17.  However, at any time, pursuant to SERA and the FLFLPA, the Union can file for binding arbitration and indeed, has threatened to do so.

211.   PERB advised the parties that oral argument on the Appeal would be scheduled September 5 or September 6, depending on the parties' availability. All parties (including the Union) promptly confirmed availability for September 6, 2023. Thereafter, PERB unilaterally delayed oral arguments to October 11, 2023. In doing so, PERB did <u>not</u> stay the certification or bargaining orders, and continues to enforce those certification and bargaining orders.

212.   Lynn-Ette's fruit and vegetable growing operations are currently in peak season, and Defendants' ongoing and threatened enforcement actions threaten to disrupt farming operations, crop yields, customer relationships, and employee relationships and goodwill.

213.   Lynn-Ette has a credible fear of prosecution for engaging in lawful and constitutional speech, including expressing opinions that could be construed as "discouraging union organization."

214.   Lynn-Ette has a credible fear of prosecution from State authorities for complying with federal law and the requirements of the H-2A program.  Specifically, Lynn-Ette's current H-2A work contracts are set to end within two months, and federal law requires Lynn-Ette to permanently discharge H-2A workers when their contractual term of employment ends. Lynn-Ette

fears the threat of having to answer unfair labor practice charges for permanently discharging these workers without providing them a right to "recall," and they cannot provide H-2A workers any "recall" rights without violating H-2A regulations.

215.   Lynn-Ette intends to operate their farms free from unconstitutional targeted interference by the State.

**Cahoon Farms**

216.   On October 31, 2022, PERB sent a Notice of Petition to Cahoon Farms. Cahoon received this Notice in early November 2022. The Notice instructed Cahoon—"within ten working days after receipt"—to submit numerous voluminous records, documents, and information, as well as to file "an original and four copies of a Response to Petition" and a detailed "Offer of Proof" containing specified information. (**Exhibit 19.**)

217.   Cahoon was not personally served with this Notice, nor was its registered agent. Instead, Cahoon received the Notice via certified mail. The certified mail receipt was signed by a non-supervisory HR employee, not by a principal, owner, or manager of Cahoon.

218.   The Notice did not include the words "Subpoena" or "Summons," and it was not styled as a court order; on its face, it did not appear to carry binding force of law. Rather, it was in the form of a letter signed by Defendant Sarah Coleman.

219.   Crucially, the Notice did not provide any sanction, penalty, or any explanation whatsoever as to what may occur in the event that Cahoon did not fully comply with the burdensome request to produce records and prepare written responses within ten days.[10] To the

---

[10] The Notice forms mailed to the other Farm Plaintiffs were substantially identical. PERB's practice and policy of informing farms that a Petition has been filed against them simply involves sending a letter via certified mail. This letter requests a response in less than two weeks but does not advise farms that non-compliance could lead to binding union certification and eventually State-mandated contract terms governing their workplace.

contrary, the last paragraph of the letter contemplated that further processing of the matter would only occur after Cahoon provided a response: "After I receive [Cahoon's] Response to the Petition and Offer of Proof, I will determine whether a conference and/or hearing is necessary or if the case can be decided on the papers before me."

220.    Cahoon was not represented by counsel at the time it received this Notice, and Cahoon had no idea that any union organizing activity had occurred on its farm. Given the novelty of the FLFLPA and union organizing in the agricultural industry, Cahoon had never interacted with PERB and did not understand the complexities of the New York labor statute. Cahoon did not realize that the Notice involved the core operations of its business and the fundamental rights of its employees.

221.    Cahoon likewise did not realize that the Notice constituted the commencement of adversarial proceedings. The word "union" or "labor union" does not appear anywhere on the Notice. Moreover, the enclosed Petition stated "There is no controversy in question"—thus, Cahoon could not ascertain that this Notice and the Petition was actually a state-endorsed lawsuit that required legal representation, or that, there was, in fact, a controversy in question.

222.    Cahoon never consented or agreed to bargain with any labor union. By stating that there is "no controversy," the union (UFW) misrepresented the nature of the petition. Even PERB regulations recognize that a petition must include "an allegation that a question or controversy exists concerning representation and a concise statement setting forth the nature thereof." PERB Rule § 251.2 (effective through February 15, 2023). Otherwise, two private parties—a farm and a labor union—are free to bargain and enter into contracts on their own without state invention. PERB never corrected this error before summarily forwarding the Petition to Cahoon, and PERB never explained to Cahoon the nature of the controversy.

223.    Among other requests, the Notice demanded that Cahoon submit "an alphabetized list of employees, with job titles, in the negotiating unit described in the Petition for the payroll period preceding the filing of the petition who remain employed at the time of filing." The enclosed Petition, however, "described" a unit of specifically 80 employees but listed the bargaining unit as "all agricultural employees."

224.    Although Cahoon employed significantly more than 80 employees, Cahoon recognized that this number corresponded to the number of H-2A temporary guestworkers that were working at the farm during that period. Cahoon had work contracts with 79 H-2A workers for time payroll period prior to the date of the Notice. Also, Cahoon knew to expect potential audits and requests for information regarding its H-2A workers, because of the detailed recordkeeping requirements of the H-2A program as set forth in federal regulations.

225.    Thus, in a good faith effort to begin complying with the PERB Notice, Cahoon compiled an alphabetized list of its H-2A workers for that payroll period.

226.    On November 11, 2022—within the deadline set forth in the Notice—Cahoon's HR staff member Sandra Misso emailed sera@perb.ny.gov (the email address listed on the Notice). The email attached a detailed spreadsheet regarding the H-2A workers. The spreadsheet included not only their names but their rates of pay and total amounts of their last paycheck. Every page of the document listed "H-2A Apple Harvest" as the department. The first page and the last page included that department in bold font. And the last page had a summary and total amount of all payments made to the "79 employees" in the "H-2A Apple Harvest" department." (**Exhibit 20.**)

227.    Ms. Misso attached this spreadsheet to her email to PERB, which stated, in full "Please refer to the attached documents that you requested from our office. If you have any questions, please do not hesitate to contact me." (**Exhibit 20.**)

228.     PERB, however, never contacted Cahoon with any questions. PERB never advised Cahoon that any other information was needed. PERB never gave Cahoon a hearing date or notice of any pending proceedings. PERB never followed up with Cahoon to ask for any other employee information. PERB never told Cahoon that the request for information apparently encompassed more than just its H-2A workers. Cahoon thought that providing the list of H-2A employees was sufficient to comply with its obligations because no one from the State agency ever told them otherwise after Ms. Misso sent her email.

229.     UFW likewise did not communicate with Cahoon in any way during this time period.

230.     PERB never involved Cahoon in any investigation that it was apparently conducting to determine whether UFW had satisfied its showing of interest and to determine whether the petitioned-for unit was an appropriate bargaining unit.

231.     Without further inquiries to Cahoon, PERB had no way of knowing the total number of agricultural employees employed by Cahoon, and thus no way of knowing whether UFW had submitted dues deduction authorization cards signed by a majority of Cahoon's agricultural employees.

232.     Nonetheless, Cahoon did not hear anything from PERB until December 7, 2022, when PERB (the Board Members, not an administrative law judge) issued a one-page Certification of Representative and Order to Negotiate. (**Exhibit 21.**)

233.     PERB's December 7 Order stated that a "representation proceeding [had] been conducted" in accordance with SERA, and that "a negotiating representative has been selected." The Order then "certified that [UFW] has been designated and selected by a majority of the employees of the above-named employer, in the unit found to be appropriate as described below,

as their exclusive representative for the purpose of collective negotiations and for all purposes authorized by [SERA]." The unit was described as "all agricultural employees."

234.   In response to PERB's Notice and the request to submit an alphabetized list of employees in the petitioned-for bargaining unit, Cahoon had only submitted names of its H-2A temporary guestworkers, whom Cahoon does not consider to be permanent employees.

235.   The Board's Order provided no further guidance or instructions to Cahoon as to which employees should be considered "agricultural employees" and which employees should be "excluded: all other employees." Cahoon employs certain other seasonal employees who are involved in the agriculture operations, including tree trimmers and some non-H-2A workers who pick apples. Cahoon has other employees who are not involved in agriculture operations.

236.   The Order also did not include any detail as to its basis for concluding that UFW had been "selected by a majority of the employees." Similarly, the Order did not expand on the "representation proceeding" that had been "conducted." Cahoon was never notified of any representation proceeding prior to the Order being issued.

237.   The Order plainly lacked any factual or legal support. Yet, the Order concluded by stating that Cahoon "shall negotiate" with UFW.

238.   Despite its prior silence, immediately after the issuance of the Order, UFW began sending burdensome requests for information to Cahoon. UFW organizers also called the farm and demanded that the farm bargain with the union.

239.   Cahoon retained legal counsel and, on July 17, 2023, filed a Petition for Unit Clarification.

240.   In its Petition for Unit Clarification, Cahoon explained that UFW claimed to be representing all of its agricultural employees, but that the Board's Order was not clear on the scope

of the bargaining unit. Cahoon also explained how neither "PERB nor [UFW] communicated further with" the farm after Cahoon sent the list of H-2A employees to PERB in response to the Notice of Petition. Cahoon further told PERB that "none of these non-H2A employees signed union authorization cards or desire or consent to being represented by [UFW]." Cahoon also asked to clarify whether its mechanics, truck drivers, and tractor drivers should be considered in the unit. Lastly, Cahoon reserved its rights to assert legal defenses including on the grounds of federal preemption.

241.    PERB did <u>not</u> hold a hearing in response to Cahoon's Petition for Unit Clarification.

242.    On August 3, 2023, PERB issued a written ruling on Cahoon's Petition. Specifically, Defendant Manichaikul issued a Decision of Hearing Officer, in which she dismissed the Petition for Unit Clarification. *See UFW v. Cahoon Farms*, CU-6729, 56 PERB ¶ 4409, 2023 WL 5949195 (Aug. 3, 2023).

243.    The August 3 Decision explained that the "material facts are not in dispute" and confirmed that PERB had not further contacted Cahoon after receiving the November 11, 2022 email from Ms. Misso with the attached spreadsheet of H-2A worker information. As the Decision characterized it, Cahoon "did not set forth any further response or objection regarding the appropriateness of the petitioned-for unit."

244.    The Decision further held that "[i]f Cahoon Farms had desired to argue for a limitation on the scope of the unit, the proper course would have been to specifically so state in the prior proceeding, in its response to the UFW's petition for certification." Of course, Cahoon was never a party to any "proceeding," nor did it have notice that it would face the drastic sanction of a certification and order to bargain covering all agricultural employees—over the objections of many of the workers themselves.

245.    The August 3 Decision then—incredibly—explained that "[t]o the extent that Cahoon Farms seeks to argue that if non-H-2A employees were included in the calculation of the unit, the UFW would not have had sufficient dues deduction authorization cards to establish majority support, as explained above, the time to make this argument and provide supporting evidence has passed." *See UFW v. Cahoon*, 2023 WL 5949195. Thus, with this ruling, PERB has taken the position that, under SERA and the FLFLPA, a labor union can be certified without the agency ever actually ascertaining whether the union actually ever had support from the majority of employees.

246.    The August 3 Decision concludes by finding that the bargaining unit includes "all employees of Cahoon Farms, an agricultural employer under the Act, who meet the statutory definition of employee, including both H-2A and non-H-2A employees," and by ordering Cahoon to "negotiate collectively with the UFW."

247.    Previously, in a separate ruling before any negotiations had occurred, PERB declared an impasse regarding Cahoon and UFW. PERB ordered Cahoon to negotiate with UFW through a state-assigned mediator.

248.    At any time, the Union can choose to file for impasse arbitration and PERB will be compelled by the statute to assign a state-designated arbitrator to draft rules and regulations that will govern working conditions of all Cahoon agricultural employees—even though PERB never truly determined whether the majority of such employees ever signed union cards, and even though Cahoon never had a meaningful opportunity to contest the Certification Petition and subsequent Order.

249.     Cahoon's operations are currently in peak season, and Defendants' ongoing and threatened enforcement actions threaten to disrupt farming operations, crop yields, customer relationships, and employee relationships and goodwill.

250.     Cahoon has a credible fear of prosecution for engaging in lawful and constitutional speech, including expressing opinions that could be construed as "discouraging union organization."

251.     Cahoon has a credible fear of prosecution from State authorities for complying with federal law and the requirements of the H-2A program. Specifically, Cahoon's current H-2A work contracts are set to end within two months, and federal law requires Cahoon to permanently discharge H-2A workers when their contractual term of employment ends. Cahoon fears the threat of having to answer unfair labor practice charges for permanently discharging these workers without providing them a right to "recall," and they cannot provide H-2A workers any "recall" rights without violating H-2A regulations.

252.     Cahoon intends to operate their farms free from unconstitutional targeted interference by the State.

## COUNT I
## Supremacy Clause – Federal Preemption Related to H-2A Statute and Regulations

253.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 252 of this Complaint as if fully set forth herein.

254.     The Supremacy Clause of the United States Constitution provides that federal law "shall be the law of the Land … and any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

255.     As interpreted by the Supreme Court, the Supremacy Clause prohibits states from enforcing or applying any law or regulation in a way that conflicts with federal law. Likewise,

states may not regulate or prosecute laws or regulations that intrude on certain fields of law that implicate unique federal concerns.

256.    When an area of law involves "uniquely federal interests," that area is "so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced." *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504 (1988) (citing *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981)).

257.    "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Federal power over immigration "is extensive and complex" because it "involve[s] policy choices that bear on this Nation's international relations." *Id.* at 395.

258.    State laws regulating migrant workers are particularly prone to preemption because immigration is "an area traditionally of federal concern." *Maine Forest Prod. Council v. Cormier*, 51 F.4th 1, 6 (1st Cir. 2022) (holding that a Maine law was preempted by the federal H-2A program).

259.    The United States government has exercised its authority in the field of immigration by enacting the Immigration and Nationality Act ("INA"), as amended by the IRCA, and numerous regulations pursuant thereto, including the statutory and regulatory scheme that sets forth and governs the H-2A visa program. The INA sets the terms under which aliens may enter and work in the United States.

260.    The INA preempts state laws that conflict with the INA or stand as an obstacle to its accomplishment or the execution of the full purposes and objectives of the United States government with respect to its passage and enforcement.

261.    In the five separate decisions issued by PERB administrative law judges detailed above, the State of New York has required the Farm Plaintiffs (all of whom are participants in the federal H-2A program) to collectively bargain over the terms and conditions of H-2A visa-holding guestworkers. PERB has refused to stay these decisions and continues to actively enforce these holdings against the Farm Plaintiffs.

262.    Applying SERA to H-2A workers conflicts with both the text and the purpose of the federal immigration statutes and the H-2A regulations. By requiring New York farms to collectively bargain with a third-party labor union regarding the terms and conditions set forth in the contracts of H-2A workers, the State is improperly regulating the field of immigration law and the employment of nonimmigrant temporary guestworkers who may only work in this country pursuant to the terms set forth by federal law.

263.    The Farm Plaintiffs simply cannot comply with PERB's Orders without violating federal law. Complying with parts of the State law and the remedies permitted therein would require the Farm Plaintiffs to breach their H-2A work contracts and violate numerous obligations imposed on them by the federal government as a condition of participation in the H-2A program.

264.    Among other things, Farm Plaintiffs have faced unfair labor practice charges under SERA for not guaranteeing year-to-year employment to H-2A workers, for not re-hiring former H-2A workers who absconded during their H-2A contract term and thus are ineligible to work in the United States, and for refusing to bargain over the terms of H-2A work contracts. PERB has refused to dismiss these sorts of unfair labor practice charges, and PERB continues to assist labor unions in prosecuting these charges against the Farm Plaintiffs. Absent intervention by this Court, the Farm Plaintiffs face immediate and irreparable harm of being ordered to reinstate and re-hire former H-2A workers without a job order certified by the federal government allowing them to do

so, and in lieu of employing qualified domestic workers who must be given hiring preference under federal law.

265.    Farm Plaintiffs have likewise been presented with proposed collective bargaining agreements with terms that cannot be reconciled with the H-2A regulations. (**Exhibit 17.**) PERB mediators have referenced the threat of compulsory impasse arbitration to in efforts to convince the Farm Plaintiffs to enter into collective bargaining agreements with third-party labor unions.

266.    Plaintiffs continue to suffer ongoing harm as a result of Defendants' enforcement of the FLFLPA and SERA, and Plaintiffs will further suffer immediate and irreparable harm as a consequence of Defendants' actions, including permanent loss of revenue and income, civil and criminal penalties levied by the federal government, inability to participate in the H-2A program, inability to hire qualified domestic workers, the loss of valuable employees, loss of customers and customer goodwill, and significant disruptions to agricultural operations and the food supply.

267.    Whether the State of New York may compel agricultural employers to violate their obligations under federal law as participants in the H-2A program is a purely legal question ripe for adjudication.

268.    Plaintiffs bring this count pursuant to 42 U.S.C. §§ 1983 and 1988(b), 28 U.S.C. §§2201-2202, 28 U.S.C. § 1331, and 28 U.S.C. § 1343, which, together, authorize the Court to grant declaratory and injunctive relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

## COUNT II
### Due Process – Deprivation Without Notice and Opportunity to be Heard

269.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 268 of this Complaint as if fully set forth herein.

270.    The Fourteenth Amendment of the Constitution of the United States provides that no State "shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

271.    "The right to prior notice and a hearing is central to the Constitution's command of due process." *United States v. James Daniel Good Real Property*, 510 U.S. 43, 53 (1993).

272.    Consistent with this Constitutional guarantee, New York courts have repeatedly held that "an opportunity to be heard in an administrative proceeding is fundamental as to the aggrieved person." *Matter of Bowen v. Comm of Correc.*, 124 Misc. 2d 592, 594 (N.Y. Sup. Ct. 1984).

273.    PERB is a state agency that has asserted power to adjudicate disputes between private parties, issue binding orders, and impose monetary and equitable penalties against private sector employers. PERB has asserted and threatened to assert its power to decide the rights of private parties, impose obligations on private parties, and deprive private parties of liberty and property.

274.    PERB is required to adhere to the constitutional "fundamental requisite of due process in connection with administrative proceedings," which includes the requisite that a party be given "an effective chance to defend themselves by confronting adverse witnesses before an impartial decision maker." *Mount St. Mary's Hosp. v. Catherwood*, 26 N.Y.2d 493, 518 (N.Y. 1970). Notably, "the right to such hearing in all its essentials may exist even though the statutes do not require a hearing." *Matter of Bowen*, 124 Misc. 2d at 594.

275.    When a state deprives a person of a property or liberty interest—such as the rights of an employer to not be subjected to penalties or fines, to enter into contracts with its employees, to earn a living, to freely engage in political speech regarding unionization, and many others—a

hearing must be granted before the deprivation of the right, or in some circumstances, promptly thereafter. *Cf. Ingram v. Wayne Cnty.*, No. 22-1262, at *2 (6th Cir. Aug. 31, 2023) ("We agree and hold that Wayne County violated that Constitution when it seized plaintiffs' personal vehicles—which were vital to their transportation and livelihoods—with no timely process to contest the seizure. We further hold that Wayne County was required to provide an interim hearing within two weeks to test the probable validity of the deprivation.").

276.   Despite this Constitutional requirement, PERB has taken the position that "[h]earings in front of a hearing officer are discretionary" and "not required by law."  This refusal to hold hearings violates the Due Process Clause.  Private parties—including the Farm Plaintiffs—therefore are having their rights adjudicated and being deprived of property and liberty interests without an opportunity to be heard and present evidence in front of a neutral decision maker.

277.   Additionally, given the breadth and scope of potential deprivations—including eventually having a State-drafted collective bargaining agreement imposed on the farm as force of law—PERB does not provide adequate notice to agricultural employers. The only notice provided to employers prior to certification is a letter from PERB, sent via certified mail and not personally served, which requests employee information. Nowhere on this letter are employers provided notice that a binding certification and eventually a binding contract would be imposed on the farm and its employees if the burdensome instructions on the letter are not strictly complied with. *See supra*, ¶¶ 216-229.

278.   If an employer does not understand its obligations and reaches out to PERB to clarify the issues detailed in the letter, or if an employer provides some of the requested information and asks PERB to "not hesitate to contact me" if there are "any questions," *supra*,

¶ 227, PERB will ignore the employer and instead summarily issue a binding certification and order to negotiate, under threat of civil and criminal penalties for non-compliance.

279.    Current PERB Rules only allow agricultural employers "8 calendar days after receipt of a copy of the petition" to submit a response, which "must be received by the hearing officer by noon on the 8th calendar day." PERB Rule § 263.24(a). Prior PERB Rules required a response within 10 working days. This response must include a statement of position that must conform to confusing and burdensome specifications. Among other things, PERB Rules provide: "Any allegation in the petition which is not specifically denied shall be deemed to be true. The employer may not raise any issue in the proceedings which has not been raised in a timely statement of position. Failure to timely provide the required employee lists shall preclude an employer from contesting the appropriateness of the proposed unit." PERB Rule § 263.24(b). The required statement of position also "shall include a list of the full names, work locations, shifts, and job classifications of all individuals in the proposed unit as of the payroll period preceding the filing of the petition who remain employed at the time of filing." PERB Rule 263.24(e).

280.    The eight-day deadline also encompasses the requirement for employers to set forth all evidence that it intends to use in support of its position and "identify each witness the party would call and summarize each witness's testimony." PERB Rule § 263.24(c). The "hearing officer" has discretion to determine that the employer's evidence "is insufficient," in which case "the evidence shall not be received." *Id.*

281.    Farms thus have little more than one week to figure out how to comply, gather all evidence, identify witnesses, and prepare legal arguments and a written response. Farms that do not fully "by noon on the 8th calendar day" are forever barred from raising arguments or presenting evidence, and they face the sanction of immediately being ordered to bargain with whichever unit

of employees the labor union listed on their petition, as well as being indefinitely certified as a unionized workplace with no recourse to challenge that order. *Cf. Goldberg v. Kelly*, 397 U.S. 254, 268 (1970) (recognizing that "seven-day notice" could be "constitutionally insufficient" in some circumstances, and "there may be cases where fairness would require that a longer time be given.").

282.    Notably, Farm Plaintiffs were never provided with full notice of these detailed requirements. For farms like Plaintiff Cahoon who did not immediately retain counsel to interpret and decipher their requirements, PERB provided no guidance or assistance in complying.

283.    In contrast to imposing and enforcing these strict and byzantine requirements on the employer, PERB provides that labor unions petitioning for certification will not have their petitions dismissed "for failure of the petitioner to set forth in the petition all the information required." PERB Rule § 263.21.

284.    PERB's ruling that hearings are "not required by law" further violates the Due Process Clause by failing to follow the actual statutory text, thereby depriving parties of notice as to their rights and obligations under the law. Specifically, Section 705(3) of the SERA unequivocally requires a hearing: "***Whenever*** it is alleged by an employee or his representative, or by an employer or his representative, that there is a question or controversy concerning the representation of employees, the board ***shall*** investigate such question or controversy and . . . [i]n ***any*** such investigation the board ***shall*** provide for an appropriate hearing upon due notice[.]" (emphasis added). Of course, when a statute includes the word "shall," it "must be construed as a mandatory command." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 184 (2003).

285.    Given this clear statutory directive, any "employer or his representative" faced with a representation petition expects that upon making an allegation of "a question or controversy," there will be hearing.  By ruling—through adjudication and with no prior notice or guidance at the

time that Farm Plaintiffs' matters were processed—that hearings in these circumstances are actually "discretionary," PERB and Defendant Sarah Coleman not only violated Farm Plaintiffs' statutory rights but also their due process rights.

286.    This issue is not a matter of Defendants making an error regarding state law. Rather, the state law itself is unconstitutional. PERB later confirmed its rule that "Hearings in front of PERB are not mandated by law but are discretionary." (Ex. 2, p. 6.)  Defendants thus maintain an official policy or practice that deprives private parties of notice, a meaningful opportunity to be heard, and a neutral decisionmaker.

287.    The Farm Plaintiffs in fact alleged, at the earliest possible opportunity and consistent with the statute, that a question or controversy existed; consequently, the Farm Plaintiffs rightfully expected and anticipated that a hearing would be held, and this expectation influenced their strategy at every step of the process from the time they received the petition to the time PERB issued the final ALJ decisions. Nonetheless, it was not until the final administrative decision that they learned that the agency would choose to deny their right to a hearing—despite the Farm Plaintiffs repeatedly citing to this statutory hearing requirement in multiple briefs and submissions to the agency and to Defendant Sarah Coleman. The meaning of SERA § 705(3)'s hearing provision remains uncertain and has never been explained to Plaintiffs by the agency.

288.    Moreover, even PERB's new rule—that it only announced through adjudication in the same order where the employer was ordered to bargain with the union under threat of facing unfair labor charges—was not followed. Although PERB improperly held that hearings were discretionary, Defendant Sarah Coleman's Order states that hearings "are held only when there are material issues of disputed fact."  Plaintiff Kirby and Plaintiff Porpiglia both disputed— vigorously, with evidence, and at every possible opportunity—material factual contentions made

by the Union in support of its request for certification without an election. Yet, PERB nonetheless refused to provide a hearing and thus barred the Plaintiffs from ever having a right to present its evidence before issuing binding orders depriving Plaintiffs of their rights.

289.    PERB has concluded that SERA, as amended by the FLFLPA, does not require notice or a hearing before depriving agricultural employers of liberty and property interests. This ruling renders SERA's bargaining representative certification process facially unconstitutional.

290.    For the Farm Plaintiffs that have already suffered a deprivation of their liberty and property interests, PERB has refused to stay the binding orders—to the contrary, PERB has been enforcing the orders for months, including denying requests to stay the bargaining orders.

291.    Plaintiffs continue to suffer or will imminently suffer irreparable harm including through having to engage in administrative proceedings before an agency that does not follow the law.

292.    Plaintiffs will further suffer immediate and irreparable harm as a consequence of Defendants' actions, including permanent loss of revenue and income, potential civil and criminal penalties, inability to participate in the H-2A program, inability to hire qualified domestic workers, the loss of valuable employees, loss of customers and customer goodwill, compliance and litigation costs, and significant disruptions to agricultural operations and the food supply.

293.    Plaintiffs bring this count pursuant to 42 U.S.C. §§ 1983 and 1988(b), 28 U.S.C. §§2201-2202, 28 U.S.C. § 1331, and 28 U.S.C. § 1343, which, together, authorize the Court to grant declaratory and injunctive relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

## COUNT III
### Due Process – Improper Agency Structure; Biased, Non-Neutral Decisionmaker

294.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 293 of this Complaint as if fully set forth herein.

295.     The organizational structure of PERB, as well as the way it actually operates in practice, does not comport with due process.

296.     The Defendants, through PERB, prosecute and deprive agricultural employers of their rights without due process of law because the inherent operational structure of the PERB agency is unconstitutionally flawed. Private sector employers appearing before PERB are denied the right to impartial judicial or administrative review.

297.     Due process is violated when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). Due process is also violated when "conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Id.*

298.     "[D]ue process does not permit the same individual to issue the initial decision finding violations and ordering remedies, participate personally in the prosecution of the case before an administrative law judge ('ALJ'), and then make the final agency decision that will receive only deferential judicial review." *Horne v. Polk*, 242 Ariz. 226, 228 (2017).

299.     Until July 2023 and all times throughout the processing of the Farm Plaintiffs' matters until the respective Decisions, one individual—Sarah Coleman—held three positions concurrently. She served as the agency's Acting Director, Deputy Chair of the Board, and a Hearing Officer. This co-mingling of investigative, policymaking, and adjudicative functions within the same agency is already problematic on its face—but here, the violation is even more

egregious because one single individual performs all three functions. This structure and function tainted the entire proceedings and rendered the Certification Decisions and Bargaining Orders issued—and which continue to be enforced—in the matters of Plaintiffs Kirby, Porpiglia, Cahoon and Lynn-Ette *void ab initio*.

300.    In her capacity as Deputy Chair of the Board, Coleman works hand in glove with the Board. PERB's website conspicuously admits that the Deputy Chair's responsibilities even include "the drafting of Board decisions for review and adoption by the Board." *See* https://perb.ny.gov/office-of-the-chairman/. Thus, employers have no true right to appeal to a neutral body; when the same person who decided the case in the first instance may be the one who also writes the appellate-level decision, the right to appeal is illusory at best.

301.    Indeed, employers are directed to submit all evidence, pleadings, motions, and briefs—at the investigative stage, the hearing officer decision stage, and the board appeal stage— to one email address: sera@perb.ny.gov. Upon information and belief, this email account is personally run by Defendant Sarah Coleman and her direct staff.

302.    The core issue in representation proceedings—whether or not the union has majority support—is decided by the Director/Hearing Officer without the employers having an opportunity to view the union's evidence or provide a meaningful response. PERB deems this determination to be an unreviewable ministerial act.

303.    The federal NLRB and analogous labor boards in other states do not operate in such an unconstitutional manner. In NLRB proceedings, the parties have a right to a hearing before an unbiased administrative law judge, review by a Regional Director, and review by a three-member Board. Unfair labor charges are investigated by field attorneys before the parties have an opportunity to present evidence and arguments to an administrative law judge. And NLRB

policymaking is handled through an independent General Counsel. None of these checks and balances exist with PERB.

304.    In addition to the agency's structural problems, Defendant Sarah Coleman has exhibited unmistakable bias against employers. Given that she is charged with policymaking and reports directly to the Board and ultimately to the Governor, this bias is inherent to the role. But when political policymakers are also tasked with investigating disputes, making on-the-ground factual determinations, prosecuting representation and unfair labor charges on behalf of labor unions, and then acting as judge in the same matter—there is an unconstitutionally high risk of bias and prejudgment at every step of the proceedings, and the practice must be stopped.

305.    Additional evidence of actual bias by Sarah Coleman include: 1) she was presented with two nearly identical sets of facts (in the Porpiglia case and the Crist Bros case) but issued two conflicting decisions (regarding the community of interest between orchard and packing workers) that are impossible to reconcile; and 2) her actions and decisions on procedural matters throughout the case evidence a strong pro-union bias. For instance, she has told union lawyers that they only need to comply with the "spirit" of the law, whereas the Employer is highly scrutinized. This bias is also reflected in her Decisions issued in cases for each of the respective matters involving the Farm Plaintiffs.

306.    For the Farm Plaintiffs that have already suffered a deprivation of their liberty and property interests, PERB has refused to stay the binding orders—to the contrary, PERB has been enforcing the orders for months.

307.    The actions of the State agency—both by design and in operation—do not protect the due process rights of private sector agricultural employers faced with representation petitions and unfair labor charges.

308.     Plaintiffs bring this count pursuant to 42 U.S.C. §§ 1983 and 1988(b), 28 U.S.C. §§2201-2202, 28 U.S.C. § 1331, and 28 U.S.C. § 1343, which, together, authorize the Court to grant declaratory and injunctive relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

**COUNT IV**
**Due Process – Vagueness**

309.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 308 of this Complaint as if fully set forth herein.

310.     "The vagueness doctrine, derived from the Due Process Clause, ensures that persons need not 'speculate' as to the meaning of statutes, but rather are 'informed as to what the State commands or forbids.'" *Melendez v. City of New York*, 16 F.4th 992, 1014-15 (2d Cir. 2021) (quoting *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007)). "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado* , 530 U.S. 703, 732 (2000).

311.     "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

312.     SERA Section 704-b provides that "it shall be an unfair labor practice for an agricultural employer to . . . discourage union organization." The phrase "discourage union organization" is not defined in the statute. However, it is not limited to "discourag[ing] an employee from participating in a union organizing drive," because that prohibition is listed as a separate basis for an unfair labor practice.

313.    The broad prohibition on an agricultural employer discouraging union organization is simply too vague to put agricultural employers on notice of what conduct or speech is prohibited. Moreover, the word "discourage" is prone to subjective and arbitrary enforcement.

314.    Many of the Prior PERB Rules, under which the Farm Plaintiffs' matters were initially processed, were vague and contradictory. (**Exhibit 1**.) The current PERB Rules and the SERA statute likewise include similar vague language.

315.    SERA Section 705(3) provides that whenever a party to a representation proceeding alleges "that there is a question or controversy," the agency "shall investigate." But the terms "question or controversy" and "investigate" are not defined and do not provide notice to parties as to what needs to be alleged and which, if any, remedies are available. Not only does this provision encourage arbitrary application, but arbitrary application has in fact occurred to the Farm Plaintiffs in this case.

316.    Although the Farm Plaintiffs submitted documents and briefs expressly alleging a "question or controversy" and urging an investigation, PERB ruled—in the matters of Kirby Farms and Porpiglia Farms—that no investigation was warranted pursuant to the statute, which also provides that "in any such investigation, the board shall provide for an appropriate hearing upon due notice." SERA § 705(3). At the same time, PERB has provided no guidance regarding how or when an employer can comply with the statute's contemplation that a party may allege a question or controversy and be entitled to an investigation or a hearing. Parties do not know what may be permitted or prohibited under the terms of this statute. Therefore, the statute is unconstitutionally vague.

317.    SERA Section 705(1) provides, "In the event that either party provides to the board, prior to the designation of a representative, clear and convincing evidence that the dues deduction

authorizations, and other evidence upon which the board would otherwise rely to ascertain the employees' choice of representative, are fraudulent or were obtained through coercion, the board shall promptly thereafter conduct an election."

318.    As illustrated in the proceedings involving the Farm Plaintiffs, this provision of SERA Section 705(1) is unconstitutionally vague and deprives parties of due process because it does not define or explain how a party may provide the requisite evidence to the board. PERB has interpreted this provision so as to not allow consideration of affidavits and declarations. At the same time, PERB has not allowed parties to provide evidence in the form of live testimony because it has made dispositive rulings that agricultural employers did not meet the "clear and convincing evidence" standard without prior notice of a hearing or any other opportunity to present additional evidence or testimony. Therefore, parties do not know how to properly comply with this provision of the statute, and it is ripe for subjective, arbitrary, and discriminatory enforcement.

319.    Finally, and critically, SERA Section 709 provides **criminal liability** and **imprisonment** for "[a]ny person who shall willfully resist, prevent, impede, or interfere with any member of the board or any of its agents or agencies in the performance of duties pursuant to this article, or who shall in any manner interfere with the free exercise by employees of their right to select representatives in an election directed by the board pursuant to section seven hundred and five." Concerns of vagueness are particularly heightened when violations or a statutory prohibition may subject the alleged violator to arrest and criminal prosecution by the State. This Section includes a number of vague words such as "resist, prevent, impede or interfere" that could be interpreted to criminalize speech and other lawful conduct. Likewise, the statute leaves undefined which actions by the board or its agents may constitute "performance of duties" or the scope to which one may legally or illegally "resist" the performance of those duties.

320.     Plaintiffs bring this count pursuant to 42 U.S.C. §§ 1983 and 1988(b), 28 U.S.C. §§2201-2202, 28 U.S.C. § 1331, and 28 U.S.C. § 1343, which, together, authorize the Court to grant declaratory and injunctive relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

### COUNT V
### Due Process and Equal Protection Clause – Compulsory Arbitration Regime

321.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 320 of this Complaint as if fully set forth herein.

322.     SERA Section 702-b requires private parties to submit to a state-directed arbitration process where the state will impose and enforce binding contractual terms and conditions onto the parties without their consent.

323.     This compulsory arbitration scheme infringes on the liberty and property interests of private employers and employees, including their First Amendment rights of freedom of association.

324.     New York's mandatory imposition of collective bargaining agreements on private parties is unique and represents a sharp deviation from the settled principles of labor law that have long governed at the federal level and every other state, with the possible exception of California. *See, e.g.*, *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 45 (1937) (U.S. labor law "does not compel agreements between employers and employees," and "does not compel any agreement whatever").

325.     The New York scheme transforms the state into a master drafter of a purported "collective bargaining agreement" that is neither collectively bargained nor agreed-upon by the parties to whom it will apply. Rather, the state-drafted and enforced "agreement" is better

characterized as a statute or regulation—one that is targeted to only apply to one employer and any of its current or future employees.

326.     Section 702-b runs afoul of the fundamental principle that laws and regulations should apply generally to all members of society, thereby violating the Equal Protection Clause of the Fourteenth Amendment by arbitrarily burdening individuals as individuals. Laws and regulations that arbitrarily burden individuals as individuals are impermissible "class-of-one" laws that violate the Constitution's equal protection guarantees. *Village of Willowbrook v. Olech* , 528 U.S. 562, 564 (2000).

327.     Section 702-b has no binding standards to ensure that similarly situated parties are treated equally—actually, the vague enumerated factors that the arbitrator is to "take into consideration" envision that each compelled contract will be different. For instance, one factor is "the financial ability of the agricultural employer to pay." Every agricultural employer will have a different ability to pay. There is nothing within the compulsion regime to prevent the imposition of an agreement that disadvantages a single employer without applying to similarly situated competitors.

328.     The enumerated factors are discretionary, and the arbitrator is permitted to consider "any other relevant factors." The compulsion regime gives the arbitrator complete freedom to assign whatever weight—or none at all—to any factor.

329.     When combined with the ad hoc card check process, the lack of decertification options, and SERA § 704's announcement that agreements with a labor organization can require "as a condition of employment membership therein," the compulsory arbitration scheme implicates the First Amendment rights of employees. The State of New York is compelling both agricultural employers and employees to associate with a labor union—a practice that has been

held unconstitutional under *Janus v. AFSCME Council 31*, 138 S. Ct. 2448 (2018). Therefore, because the Equal Protection Clause violation contemplated by compulsory arbitration scheme involves a fundamental right, it is subject to strict scrutiny. *See Jones & Laughlin*, 301 U.S. at 33 (the right of laborers to organize and select their representatives is a "fundamental right"); *Metro. Edison Co. v. NLRB,* 460 U.S. 693, 708 (1983). *See also* SERA § 700 (describing the right of covered employees to designate "representatives of their own choosing for purposes of collective bargaining" as an exercise of their right of "freedom of association").

330.    The compulsory arbitration regime imperils Plaintiffs' ability to operate their business. Even "less than complete inability to pursue one's chosen profession" gives rise to a cognizable substantive due process claim. *Hund v. Cuomo*, 501 F. Supp. 3d 185, 203 (W.D.N.Y. 2020). In fact, "the Second Circuit [has] held that 'a specific deprivation of [plaintiff's] opportunity to seek employment caused by a statutory impediment established by the state' supported a substantive due process claim." *Id.* (quoting *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994)).

331.    Moreover, the State fails to provide any adequate procedures or due process akin to the procedural due process guaranteed to parties in litigation or criminal proceedings who may have binding decrees imposed on them to govern their conduct. Employers have no right to a jury trial before the State assesses what could amount to substantial economic penalties. *See* U.S. Const, amend. VII ("where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved"). Instead, the State permits its arbitrator to impose substantive contractual terms and employment regulations to private parties, in what effectively amounts to a bill of attainer. *See Selective Service System v. Minnesota Public Interest Research Group*, 468 U.S. 841, 847 (1984) ("The singling out of an individual for legislatively prescribed punishment constitutes an attainder whether the individual is called by name or described in terms of conduct which,

because it is past conduct, operates only as a designation of particular persons." (quotations omitted)).

332.    New York may set minimum-wage and maximum-hour laws; it may establish lawful rules for recognition of labor unions; and it has broad discretion to regulate workplaces through law. But it cannot by decree compel one employer and its workers to enter into the state's notion of a proper "contract" or craft legal rules applicable to them and no one else.

333.    In effect, the compulsory arbitration regime envisions granting one "arbitrator" full authority to draft enforceable minimum wage, overtime, termination for cause, seniority, and other employment laws on an individualized, farm-by-farm basis. Farms are not notified of this consequence when they first receive notice of a union petition and have no more than 8 days to raise any and all legal factual arguments in opposition to certification.

334.    At every turn, PERB has signaled its intent to enforce the compulsory arbitration scheme—in fact, with respect to Farm Plaintiffs Kirby, Porpiglia, Cahoon, and Lynn-Ette, the process already began when PERB ordered the farms to engage in mediation with a state-appointed mediator. Mediators have warned Plaintiffs and their respective counsel that compulsory arbitration is forthcoming.

335.    Plaintiffs bring this count pursuant to 42 U.S.C. §§ 1983 and 1988(b), 28 U.S.C. §§2201-2202, 28 U.S.C. § 1331, and 28 U.S.C. § 1343, which, together, authorize the Court to grant declaratory and injunctive relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

### COUNT VI
### First Amendment – Viewpoint-based Speech Restriction

336.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 335 of this Complaint as if fully set forth herein.

337.    The First Amendment, as made applicable to the states by the Fourteenth Amendment. provides that the government "shall make no law … abridging the freedom of speech."

338.    Government action that regulates speech on the basis of that speech's content is inherently suspect and "presumptively unconstitutional" under the First Amendment. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A content-based restriction regulates the "public discussion of an entire topic." *Id.* at 156. Viewpoint discrimination is a type of content discrimination, but a "more blatant" type. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

339.    Laws that restrict speech based on the viewpoint of the speaker are *per se* invalid under the First Amendment. *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) (noting that content-based restrictions "must satisfy strict scrutiny," but "restrictions based on viewpoint are prohibited"); *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) (holding that the First Amendment "forbids the government [from] regulat[ing] speech in ways that favor some viewpoints or ideas at the expense of others.").

340.    With its enactment of the FLFLPA amendments to SERA, New York has expressly enshrined viewpoint-based speech restrictions into law.

341.    SERA Section 704-b provides, "it shall be an unfair labor practice for an agricultural employer to," among other things, "discourage union organization or to discourage an employee from participating in a union organizing drive, engaging in protected concerted activity, or otherwise exercising the rights guaranteed under this article."

342.    This provision of Section 704-b, which only applies to agricultural employers, restricts the voicing of opinions regarding union organizing—a content-based restriction—but

only when those opinions could be construed as discouragement of union organizing—an additional viewpoint-based restriction. *Encouraging* union organization is permissible.

343.    Unlike the NLRA's narrowly tailored restrictions on overt threats or unlawful promises to workers in the union organizing context, New York's broad restriction encompasses protected political speech and the voicing of opinions and facts. The NLRA provides that, "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit." 29 USC § 158 (c). No such limiting principles apply to the purely viewpoint-based speech restrictions of New York law.

344.    This provision of New York law is facially unconstitutional under the First Amendment.

345.    PERB has prosecuted, and continues to prosecute, unfair labor charges against the Farm Plaintiffs and other New York farms on the basis of this exact statutory provision, SERA § 704-b(2)(c).

346.    Plaintiffs bring this count pursuant to 42 U.S.C. §§ 1983 and 1988(b), 28 U.S.C. §§2201-2202, 28 U.S.C. § 1331, and 28 U.S.C. § 1343, which, together, authorize the Court to grant declaratory and injunctive relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

### COUNT VII
### First Amendment – Compelled Speech (*Janus*)

347.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 346 of this Complaint as if fully set forth herein.

348.    Under *Janus v. AFSCME*, 138 S.Ct. 2448 (2018), a state cannot compel employees to subsidize union speech through paycheck dues deductions.

349.    Through the FLFLPA amendments, New York applies and enforces the provisions of SERA to private sector agricultural employers and employees.

350.    The state action requirement of First Amendment claims is met because the state is directly compelling employers to deduct union dues and agency fees from worker paychecks, including through denying workers the right to vote in a secret ballot election, through the compulsory impasse arbitration process, through requiring union membership as a condition of employment, through disallowing decertification, through failure to provide a process for revocation of dues deduction cards, and through having unreviewable discretion to determine the validity of dues deduction authorizations.

351.    To the extent necessary, Plaintiffs have standing to seek redress not only for the violations of its own rights, but the rights of their employees. *See, e.g.*, *Truax v. Raich*, 239 U.S. 33, 38-39 (1915); *Wolff Packing Co. v. Indus. Court*, 262 U.S. 522 (1923). Under New York law, only the employer and the union, not the workers, can file for an impasse order or challenge the imposition of an impasse order. The impasse order initiates the process that permits the State to order compulsory union dues and fees deductions from worker paychecks.

352.    Every proposed contract that has been presented to the Farm Plaintiffs—under threat of state-compelled imposition—has included a clause requiring the farm to "deduct from each employee's pay all periodic dues or agency fees as determined by the Union." *See, e.g.*, Exhibit 17.

353.    Under *Janus*, states need "clear and compelling evidence" that employees have waived their First Amendment rights before deducting union dues from employee paychecks.

354.    New York flips that rule by considering union dues deduction cards submitted by unions to be presumptively valid and putting the burden on the employer to present "clear and convincing evidence" that the dues deduction authorizations were obtained through fraud or coercion.

355.    PERB does not allow the employer to challenge or inspect the union dues deduction authorizations. Under New York law, as PERB has expressly ruled, "Review of dues deduction authorization cards is a purely internal administrative matter for the hearing officer." PERB likewise denies employees the right to review a dues deduction authorization card that the union claims to have submitted on their behalf.

356.    PERB has also delegated to unions the full authority to decide when and how an employee can revoke their dues deduction authorization cards. As explained in multiple PERB decisions and rulings, New York law provides no basis "for allowing revocation outside the terms set forth in the cards themselves." Consequently, PERB has declined to allow employees to revoke their cards.

357.    Practically speaking, given the PERB rule, employees can never revoke their dues deduction authorization cards. The UFW dues deduction authorization cards state that they may only be revoked "by providing my written revocation to my employer and the UFW within sixty (60) days following the date of the anniversary of my original authorization." Under PERB rules, this language provides the *only* way for dues deductions to be revoked. This rule presents a number of First Amendment problems: 1) unions have motive to change the language on their cards to make revocation even more difficult or impossible; 2) PERB has denied both employees and employers the right to see their cards once the union has submitted the cards to the agency, so the employees are forced to rely on memory to know the anniversary date of their signature; and 3)

there are no procedures requiring involvement of the state agency to verify that cards have been revoked.

358.    This official policy of the State of New York is also stated in PERB's January 2023 published responses to public comments: "The SERA and the FLFLPA do not provide for withdrawal or revocation of cards." (Ex. 2, p. 3).

359.    PERB's January 2023 published guidance likewise confirms that the State has delegated to unions the authority to decide when or how a dues deduction card can be revoked: "There is no statutory authority for PERB to impose specific requirements on dues deduction cards, which are generated by a labor organization (union) and are protected union activity." (Ex. 3, p. 4).

360.    Moreover, although the text of SERA contemplates both an investigation and a hearing whenever any party alleges a question or controversy about representation, PERB has ruled that "Outside the presence of fraud or coercion, I see no basis for voiding the dues deduction authorization cards or investigating the validity of the signatures on the cards."

361.    Likewise, in every FLFLPA matter, PERB has never allowed the employer to present evidence of "fraud or coercion," so that basis for challenging the dues deduction card signatures has been rendered a nullity and effectively read out of the statute.

362.    In the Decision involving Plaintiff Kirby, Defendant Coleman explained that "even if taken as true, the allegations are insufficient to demonstrate that the dues deduction authorization cards are fraudulent or were obtained through coercion, and no hearing on this issue is necessary." These allegations that were "taken as true," included that the union was "forging signature cards," that the union asked for signatures on documents not in the workers' native language and failed to tell them that they were signing a dues deduction card, and that the union told workers they would

be guaranteed green cards and permanent residency by signing the dues deduction cards. Under PERB's practice and policy, none of these facts, even if fully proven, would constitute sufficient evidence of fraud to void any of the dues deduction cards—an inherently preposterous position.

363.   Therefore, the state is waiving the First Amendment rights of farmworkers even in cases where the state "takes as true" that the farmworkers were coerced to do so, and where the farmworkers never knew that they were waiving any rights at all. Further, the state is actively preventing workers from rescinding their waiver of rights. The state is compelling irrevocable subsidies to private labor unions.

364.   The practice and policy of PERB violates the constitutional principle requiring "'every reasonable presumption against waiver' of fundamental constitutional rights." *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666, 682 (1999) (quoting *Aetna Ins. Co. v. Kennedy ex rel. Bogash*, 301 U.S. 389, 393 (1937)).

365.   Farm workers have a First Amendment right to choose whether or not to join the union, and whether or not to subsidize union speech through dues deductions. Agricultural employers likewise have a First Amendment right to choose whether to facilitate and subsidize union speech. Agricultural employers and employees both have a constitutional right of freedom of association.

366.   The UFW Contract that may be imposed on farms as part of the compulsory impasse arbitration scheme states, "Any employee who fails to become a member of the bargaining unit within the time limit set forth herein and fails to pay the required periodic dues as determined by the Union under the terms of its Constitution, or such sum as set by the Union as an agency fee, will be immediately discharged or suspended upon written notice from the Union to the Company. The Union will be the sole judge of the good standing of its members." (Ex. 17.)

367.    Moreover, Section 705.1-a of SERA provides that employees' choice of selecting or rejecting a labor representative "shall be ascertained by the board on the basis of dues deduction authorizations instead of by an election." Therefore, employees who may have never been presented with a dues deduction card or otherwise been able to vote for their representative, would nonetheless be bound by the dues deduction cards of their co-workers so long as the PERB administrative law judge—in her sole, unreviewable discretion—determines that 50% or more of their co-workers have signed dues deduction authorization cards. And all employees at the workplace in the bargaining unit are compelled by PERB to subsidize union speech even if they never even had the opportunity to choose or vote in a union election. This procedure is unique to New York and not found in federal law or the labor laws of other states.

368.    Nothing in New York law precludes unions from using these compelled dues and fees payments for overtly political speech. UFW, for example, regularly and conspicuously engages in political speech, including through lobbying and political endorsements.

369.    These policies and practices are expressed through statutory and regulatory text, as well as through the consistent actions of PERB officials. These policies and practices are facially unconstitutional and must be enjoined.

370.    Plaintiffs bring this count pursuant to 42 U.S.C. §§ 1983 and 1988(b), 28 U.S.C. §§2201-2202, 28 U.S.C. § 1331, and 28 U.S.C. § 1343, which, together, authorize the Court to grant declaratory and injunctive relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

### COUNT VIII
### First Amendment – No Decertification; No Right to Refrain

371.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 370 of this Complaint as if fully set forth herein.

372.     Under SERA and the FLFLPA, if PERB certifies a labor union as the exclusive representative of a workplace, both the employer and all workers in the bargaining unit must associate with the labor union. And all current and future employees in the certified bargaining unit would be required to be union members and pay union agency fees and dues.

373.     Under federal labor law and the labor laws of every other state (including California), employees have the right to petition for decertification of a labor union as their representative. This decertification right is fundamental to protecting freedom of speech and association.

374.     In response to a public comment regarding the lack of decertification procedures, PERB refused to allow decertification because "the statutes do not expressly provide for decertification." (Ex. 2, p. 11).

375.     The State is thus compelling employers and employees to associate with a third-party labor union indefinitely.

376.     Similarly, and unlike the NLRA, New York law does not provide any "right to refrain" from union organizing activity for farmworkers.  There is no provision that allows farmworkers to file an unfair labor practice charge against a labor union.

377.     This policy and practice is facially unconstitutional under the First Amendment, and it has been applied to private sector employers, including Farm Plaintiffs, unconstitutionally.

378.     Plaintiffs bring this count pursuant to 42 U.S.C. §§ 1983 and 1988(b), 28 U.S.C. §§2201-2202, 28 U.S.C. § 1331, and 28 U.S.C. § 1343, which, together, authorize the Court to grant declaratory and injunctive relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

## COUNT IX
## Equal Protection Clause – Disparate Treatment of Agricultural Employers and Employees

379.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 378 of this Complaint as if fully set forth herein.

380.    The Equal Protection Clause of the U.S. Constitution requires equal treatment under the law. When a state makes distinctions between classes of individuals with respect to the exercise of fundamental rights, such as speech and association, those distinctions must be narrowly tailored to serve a compelling government interest. Under that strict scrutiny framework, the state must choose the least restrictive means of achieving its interests, and the interests must be lawful and compelling.

381.    SERA distinguishes between "labor organizations" and "company unions." A "company union" is defined as "any committee, employee representation plan or association of employees which exists for the purpose, in whole or in part, of dealing with employers concerning grievances or terms and conditions of employment, which the employer has initiated or created or whose initiation or creation he has suggested, participated in or in the formulation of whose governing rules or policies or the conducting of whose management, operations or elections the employer participates in or supervises or which the employer maintains, finances, controls, dominates, or assists in maintaining or financing, whether by compensating anyone for services performed in its behalf or by donating free services, equipment, materials, office or meeting space or anything else of value, or by any other means." SERA § 700(6). A "labor organization" is defined as "any organization which exists and is constituted for the purpose, in whole or in part, of collective bargaining, or of dealing with employers concerning grievances, terms or conditions of employment, or of other mutual aid or protection and which is not a company union as defined herein."

382.    Under SERA Section 704(4), it is unlawful for an employer "[t]o require an employee or one seeking employment, as a condition of employment, to join any company union or to refrain from forming, or joining or assisting a labor organization of his own choosing."

383.    Under SERA Section 704(5), it is unlawful for an employer "[t]o encourage membership in any company union or discourage membership in any labor organization, by discrimination in regard to hire or tenure or in any term or condition of employment."

384.    These provisions directly impact an employer's First Amendment rights of speech and association. An employer is only prohibited from *encouraging* company unions; and an employer is only prohibited from *discouraging* labor organizations. These terms are not narrowly tailored or defined.

385.    Further, SERA Section 704 proscribes a host of speech-related conduct, but each of those prohibitions only apply to employers, not unions or labor organizations.

386.    The state has targeted agricultural employers for a more restrictive set of speech-related rules, including vague prohibitions on "discouraging" union membership and "encouraging" memberships in other organizations.

387.    Likewise, only agricultural employers and farm laborers are subject to the FLFLPA's compulsory unionization provisions. No other private sector employers or workers are deprived of a right to refrain from union activity. No other private sector employers or workers are deprived of their freedom of association through, among other things, a prohibition on decertification petitions.

388.    There is no compelling government interest in violating the freedom of speech of employers in this way. But, even if there is a compelling government interest, these unilateral

restrictions on speech—which are viewpoint-based restrictions—are not the least restrictive means.

389.    SERA Section 704 is facially unconstitutional under the First Amendment and must be enjoined.

390.    A number of additional provisions in SERA and PERB Rules make improper distinctions between agricultural employers and other private sector employers, as well as between farm laborers and other private sector laborers, and other classifications that serve no legitimate government interest.

391.    Plaintiffs bring this count pursuant to 42 U.S.C. §§ 1983 and 1988(b), 28 U.S.C. §§2201-2202, 28 U.S.C. § 1331, and 28 U.S.C. § 1343, which, together, authorize the Court to grant declaratory and injunctive relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

## COUNT X
### Contracts Clause – Infringement on Farms' Existing Contractual Obligations

392.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 391 of this Complaint as if fully set forth herein

393.    The Contracts Clause categorically prohibits states from passing "any . . . Law impairing the Obligation of Contracts." Art. I, § 10, cl. 1.

394.    When a State promulgates or enforces a law in "an area never before subject to regulation by the State," and the State's actions "distort[] [a] company's existing contractual relationships with its employees by super-imposing retroactive obligations upon the company substantially beyond the terms of its employment contracts," the State violated the Contracts Clause of the U.S. Constitution. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 249-50 (1978).

395.   The Contracts Clause "continues to afford individuals the right to use contracts to order their affairs and to rely thereon except as warranted by a significant and legitimate public purpose pursued through reasonable and appropriate means." *Melendez v. City of New York*, 16 F.4th 992, 1031-32 (2d Cir. 2021). Laws challenged under the Contracts Clause must be subjected to scrutiny "more demanding than the rational basis review" standard. *Id.*

396.   When a state law "undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights," it imposes an impermissible substantial impairment that may run afoul of the Contracts Clause. *Id.* at 1032-33.

397.   "[I]n the Contracts Clause the framers were absolute. They took the view that treating existing contracts as 'inviolable' would benefit society by ensuring that all persons could count on the ability to enforce promises lawfully made to them—even if they or their agreements later prove unpopular with some passing majority." *Sveen v. Melin*, 138 S. Ct. 1815, 1826-28 (2018) (Gorsuch, J., dissenting).

398.   New York's attempt to supersede, replace, and extinguish the contracts of agricultural employers substantially impairs their contract rights.

399.   Before the FLFLPA, the state had never regulated the contractual relationships between farms and their employees. Likewise, the federal government has always exempted the agricultural industry from the scope of its collective bargaining and labor contract statutes.

400.   H-2A-participating employers must enter binding work contracts with H-2A employees for each term of employment. These comprehensive contracts impose rights and obligations on each party. Employers can face liability for breach of contract if they do not perform

as required under the work contracts, including all terms and conditions of employment, wages, and benefits.

401.    New York is the first state to ever attempt to compel farm employers and farm laborers in the H-2A program to breach their contractual obligations.

402.    New York's imposition of superseding collective bargaining agreements impairs the contract rights of both farmworkers and farm employers. The burden placed on contracting parties is not narrowly tailored and it is not precisely defined.

403.    Given that H-2A work contracts are governed and expressly required by federal law and policy, New York's policy of impairing the performance of each party's obligations under the H-2A contracts does not advance a significant or legitimate public interest.

404.    Plaintiffs bring this count pursuant to 42 U.S.C. §§ 1983 and 1988(b), 28 U.S.C. §§2201-2202, 28 U.S.C. § 1331, and 28 U.S.C. § 1343, which, together, authorize the Court to grant declaratory and injunctive relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

## COUNT XI
### Takings Clause – Compelling Union Access to Farm Property

405.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 404 of this Complaint as if fully set forth herein.

406.    The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const., amend. 5.

407.    After recognizing that the right to exclude is "one of the most treasured" rights of property ownership, the Supreme Court in *Cedar Point Nursery v. Hassid* held that a state agency

regulation that "grants union organizers a right to physically enter and occupy the growers' land" was a *per se* taking under the Takings Clause. 141 S. Ct. 2063, 2072 (2021).

408.    The State of New York, through PERB, has adopted a policy and practice of requiring farm owners to grant union organizers' access to physically enter and occupy the farm owners' property. The State has not provided, and does not intend to provide, any compensation to the farm owners in exchange for this restriction on the owners' rights to exclude.

409.    PERB has prosecuted, and continues to prosecute, unfair labor practice charges against farms who have tried to assert their right to exclude union organizers from their property.

410.    As the Supreme Court already held, this sort of agency action is unconstitutional. *See Cedar Point Nursery*, 141 S. Ct at 2069 (finding unconstitutional a regulation where "Interference with organizers' right of access may constitute an unfair labor practice, which can result in sanctions against the employer" (citation omitted)).

411.    Plaintiffs bring this count pursuant to 42 U.S.C. §§ 1983 and 1988(b), 28 U.S.C. §§2201-2202, 28 U.S.C. § 1331, and 28 U.S.C. § 1343, which, together, authorize the Court to grant declaratory and injunctive relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

## COUNT XII
### Declaratory Judgment Act

412.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 411 of this Complaint as if fully set forth herein.

413.    Pursuant to 28 U.S.C. § 2201, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

414.    Plaintiffs have standing because the facts alleged, under all the circumstances, show that there is a substantial controversy between parties having adverse legal interests.

415.    The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

416.    This Court should exercise its discretion to issue a declaratory judgment because the declaratory judgment will serve a useful purpose in clarifying and settling the legal issues involved, and the judgment will finalize the controversy and offer relief from uncertainty.

**COUNT XIII**
**Temporary, Preliminary, and Permanent Injunction**

417.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 416 of this Complaint as if fully set forth herein.

418.    Federal Rule of Civil Procedure 65 authorizes district courts to issue preliminary injunctions and temporary restraining orders.

419.    A party is entitled to injunctive relief when (1) he is likely to succeed on the merits of his claim, (2) he is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tips in his favor, and (4) a preliminary injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

420.    Because Defendants are the government or employees of the government acting in their official capacity and Plaintiffs allege constitutional violations, Plaintiffs need only to show likelihood of success on the merits because the other factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Ledesma v. Garland*, 850 F. App'x 84 (2d Cir. 2021). In such a case, a court "may not deny a preliminary injunction motion and thereby 'allow constitutional violations to continue simply because a remedy would involve intrusion into' an agency's administration of state law." *Baird v. Bonta*, No. 23-15016, at *6-8 (9th Cir. Sep. 7, 2023).  Upon showing likelihood of success

on the merits on a constitutional claims, "that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation." *Id. See also Bronx Household of Faith v. Bd. of Educ., N.Y*, 331 F.3d 342, 349 (2d Cir. 2003) ("Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed.").

421.    And such a plaintiff's likelihood of succeeding on the merits also tips the public interest sharply in his favor because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Onosamba-Ohindo v. Barr*, 483 F. Supp. 3d 159 (W.D.N.Y. 2020). *See also Pro-Choice Network v. Schenck*, 67 F.3d 359 (2d Cir. 1994) ("it is axiomatic that the government has a significant interest in protecting the constitutional rights of all persons and groups").

422.    Plaintiffs are likely to succeed on their claims against Defendants, as set forth above.

423.    An injunction is necessary to prevent irreparable harm stemming from Defendants' ongoing and imminently threatened violations of Plaintiffs' constitutional rights.

424.    An injunction would preserve the status quo that existed under New York law at all times until the effective date of the FLFLPA in 2020.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

(a) A declaration that Defendants' official policy or practice of applying SERA, as amended by the FLFLPA, to H-2A workers and employers is preempted by the INA, as amended by the IRCA, and its accompanying federal regulations.

(b) A declaration that Defendants' official policy or practice of enforcing SERA, as amended by the FLFLPA, against private sector agricultural employers is unconstitutional.

(c) A declaration that by maintaining the policies and practices described herein, Defendants have violated Farm Plaintiffs' rights under the First Amendment, Contracts Clause, Takings Clause, Due Process Clause, Equal Protection Clause, and Fourteenth Amendment of the U.S. Constitution.

(d) A declaration that Defendants continuing to maintain the policies and practices described herein would threaten to violate the constitutional rights of agricultural employers and farm laborers.

(e) A temporary restraining order prohibiting Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the order from engaging in enforcement activities against private sector agricultural employers and employees, including any and all activities related to the administration, operation, prosecution, interpretation, or enforcement of SERA, as amended by the FLFLPA, and including initiating and maintaining administrative proceedings.

(f) A temporary restraining order prohibiting Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the order from engaging in enforcement activities against Farm Plaintiffs, including any and all activities related to the administration, operation, prosecution, interpretation, or enforcement of SERA, as amended by the FLFLPA, and including initiating and maintaining administrative proceedings.

(g) A preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the order from engaging in enforcement activities

against private sector agricultural employers and employees, including any and all activities related to the administration, operation, prosecution, interpretation, or enforcement of SERA, as amended by the FLFLPA, and including initiating and maintaining administrative proceedings.

(h) A preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the order from engaging in enforcement activities against Farm Plaintiffs, including any and all activities related to the administration, operation, prosecution, interpretation, or enforcement of SERA, as amended by the FLFLPA, and including initiating and maintaining administrative proceedings.

(i) Alternatively, an order staying the application and enforcement of SERA with respect to private sector agricultural employees and farm laborers, in order to allow the parties, the legislature, and regulators sufficient time to address and correct the issues set forth in this Complaint.

(j) Reasonable attorneys' fees and costs.

(k) Any and all further relief as the Court deems just and proper, or as justice requires.

Respectfully submitted this 2nd day of October, 2023,

/s/Scott S. Allen Jr.
Scott S. Allen Jr.
LIPPES      MATHIAS LLP
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202
T: 716.853.5100
sallen@lippes.com

Joshua H. Viau
Ga Bar No. 378557
*Pro Hac Vice Forthcoming*
Boris W. Gautier
GA Bar No. 152610
*Pro Hac Vice Forthcoming* FISHER
& PHILLIPS LLP
1230 Peachtree Street, N.E.
Suite 3300
Atlanta, Georgia 30309
Tel. (404) 231-1400
Fax (404) 240-4249
jviau@fisherphillips.com
bgautier@fisherphillips.com

*Attorneys for Plaintiffs*

## VERIFICATION

I, Maureen Torrey, a Director of the New York State Vegetable Growers' Association, do hereby certify under penalty of perjury that the facts contained in Paragraphs 1 and 89 in the foregoing Verified Complaint are true and correct to the best of my personal knowledge, information, and belief.

By: _Maureen Torrey_

Maureen Torrey

Dated: September 29, 2023.

## **VERIFICATION**

I, Joel Crist, Co-owner of Crist Bros Orchards, Inc., do hereby certify under penalty of perjury that the facts contained in Paragraphs 2,  90 - 103, and 110 − 123 in the foregoing Verified Complaint are true and correct to the best of my personal knowledge, information, and belief.

By: _____

Joel Crist

Dated: October 2nd, 2023

## VERIFICATION

I, Anthony Porpiglia, President of Porpiglia Farms, Inc., do hereby certify under penalty of perjury that the facts contained in Paragraphs 3, 124-145, 147, 149-178, and 265 in the foregoing Verified Complaint are true and correct to the best of my personal knowledge, information, and belief.

By: _____

Anthony Porpiglia

Dated: September 27, 2023.

## VERIFICATION

I, James Kirby, a Member of A&J Kirby Farms, LLC, do hereby certify under penalty of perjury that the facts contained in Paragraphs 4, and 179-193 in the foregoing Verified Complaint are true and correct to the best of my personal knowledge, information, and belief.

By: _____
    James Kirby

Dated: October __/__. 2023.

## VERIFICATION

I, Donald D. Cahoon, President of Cahoon Farms, Inc., do hereby certify under penalty of perjury that the facts contained in Paragraphs 5, 216-252 in the foregoing Verified Complaint are true and correct to the best of my personal knowledge, information, and belief.

By: _____
Donald D. Cahoon

Dated: September 29, 2023.

## **VERIFICATION**

I, Darren Roberts, Owner of Lynn-Ette & Sons, Inc., do hereby certify under penalty of perjury that the facts contained in Paragraphs 6, and 194-215 in the foregoing Verified Complaint are true and correct to the best of my personal knowledge, information, and belief.

By: _Darren Roberts_

Darren Roberts

Dated: September 30 2023.

FP 48364072.1