**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEW YORK STATE VEGETABLE GROWERS ASSOCIATION, INC.; A& J KIRBY FARMS, LLC; PORPIGLIA FARMS, INC.; CRIST BROS ORCHARDS, INC.; CAHOON FARMS, INC.; and LYNN-ETTE & SONS, INC.<br><br>*Plaintiffs,*<br><br>v.<br><br>KATHLEEN HOCHUL, in her official capacity as Governor of New York; LETITIA JAMES, in her official capacity as Attorney General of New York; JOHN WIRENIUS, in his official capacity as Chairperson of the New York Public Employment Relations Board; SARAH G. COLEMAN, in her official capacity as the Deputy Chair of the New York Public Employment Relations Board and an Administrative Law Judge of New York Public Employment Relations Board; MARIAM MANICHAIKUL, in her official capacity as the Director of the New York Public Employment Relations Board's Office of Private Employment Practices & Representation and an Administrative Law Judge of New York Public Employment Relations Board.<br><br>*Defendants.* | CASE NO. 23-CV-1044<br><br>_____ |

<u>**BRIEF IN SUPPORT OF MOTION FOR TRO AND INJUNCTIVE RELIEF**</u>

Plaintiffs hereby submit this Brief in Support of their Motion for Temporary Restraining Order and Preliminary Injunction. Plaintiffs respectfully request a temporary restraining order to maintain the status quo while this Court hears evidence and arguments on Plaintiffs' request for preliminary injunctive relief to halt Defendants' ongoing unlawful conduct.

## <u>INTRODUCTION</u>

For the first time in the history of American labor law, a state compels private sector employers and laborers to join and contract with third-party labor unions. New York stands alone as the only jurisdiction to implement a regulatory scheme that compels union certification with no right to a secret ballot vote, no right to refrain from union activity, no decertification, and no right to freely

bargain. To make matters worse, the state enforces these statutory requirements—which exclusively threaten the agricultural industry—without any meaningful due process protections. In doing so, the State violates the fundamental rights of both farm laborers and agricultural employers.

In equally unprecedented fashion, the State has rubber-stamped labor unions' requests for certification of collective bargaining units made up entirely of H-2A visa-holding temporary foreign guestworkers. Federal immigration law, however, preempts the State's misguided attempt to impose bargaining agreements on H-2A program participants, who must instead adhere to federally mandated binding work contracts. Unsurprisingly, no court or agency has ever adopted the State's position. Indeed, no other state government has ever threatened to supersede H-2A work contracts with particularized, farm-by-farm labor regulations under the guise of promoting collective bargaining. By granting permanent bargaining unit status to H-2A workers over the objections of employers' permanent year-round U.S. workers, New York manifestly disregards the intent of Congress. In fact, Congress designed the entire H-2A program to benefit the domestic labor force while providing a comprehensive regulatory framework to thoroughly govern the employment relationship between farms and H-2A workers.  Family farms like Plaintiffs simply cannot afford the risk of disbarment from the H-2A program for agreeing to "recall" or "reinstate" H-2A workers when federal law imposes a countervailing *prohibition* on employing such workers outside of their approved contract dates and an equally countervailing *duty* to hire qualified domestic workers each year before even considering H-2A workers.

As a result of the 2020 Farm Laborers Fair Labor Practice Act ("FLFLPA") amendments to the State Employment Relations Act ("SERA"), New York farms must now answer to a State agency—the Public Employment Relations Board ("PERB")—that threatens to assert unprecedented power to, *inter alia*, 1) dictate terms and conditions of employment through mandatory contracts created by a government arbitrator; 2) force farms to allow union access to their property without just

compensation; 3) require farms to violate federal immigration law; 4) restrict speech that discourages union organizing; and 5) force farms to fire workers who decline to join a union or pay union dues. Any conduct deemed to "resist, prevent, impede, or interfere" with this agency can result in criminal prosecution and imprisonment. See SERA § 709. Defendants' patently unconstitutional policies and practices not only offend traditional notions of fairness, labor rights, and federalism but also threaten to disrupt New York's agricultural industry. Plaintiffs have no choice but to seek judicial intervention to halt these ongoing and threatened violations of their constitutional rights.

## ARGUMENT

As set forth below, Plaintiffs are entitled to a temporary restraining order to stay enforcement of SERA, as amended by the FLFLPA.[1] As evidentiary support for this Motion, Plaintiffs incorporate by reference the facts set forth in the Complaint, which are supported by sworn verifications that have the same force and effect as a notarized affidavit. See 28 U.S.C. § 1746.

## I.    PLAINTIFFS FACE IMMINENT THREATS OF PROSECUTION.

Plaintiffs face imminent and credible threat of prosecution and irreparable harm. Indeed, all of the Farm Plaintiffs are currently subject to enforcement actions and binding administrative orders. Plaintiffs have no adequate remedy at law because further enforcement of these orders will permanently and indefinitely change the farms' employment terms and conditions.

"[T]he standard articulated by the Supreme Court sets a low threshold and is quite forgiving to plaintiffs seeking such pre-enforcement review, as courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." Christian v. Nigrelli, 642 F. Supp. 3d 393, 401–02 (W.D.N.Y. 2022) (cleaned up). "The Supreme Court . . .

---

[1]   SERA is codified in NY Labor Ch. 31, Art. 20, §§ 700–718, and available here: https://perb.ny.gov/new-york-state-employment-relations-act. Plaintiffs cite to these provisions as SERA § 700, et al. The PERB regulations may be found at N.Y. Comp. Codes R. & Regs. tit. 12, §§ 263.1–263.123, and available here: https://perb.ny.gov/sera-rule/. Plaintiffs cite to these regulations as PERB Rule § 263, et al.

makes clear that courts are to consider whether the plaintiff's intended conduct is '*arguably* proscribed' by the challenged statute, not whether the intended conduct is *in fact* proscribed." Picard v. Magliano, 42 F.4th 89, 98 (2d Cir. 2022) (emphasis in original) (citing Susan B. Anthony List v. Driehaus, 573 U.S. 149, 162 (2014)).

Here, the 2020 FLFLPA amendments to SERA are quite recent, and Plaintiffs' claims involve their intent to engage in conduct expressly proscribed by the statute or by the agency. The Court should grant immediate injunctive relief because, among other things:

- Plaintiff NYSVGA members can receive a Petition for Certification and be compelled to respond and eventually bargain with a labor union, without due process. (Verified Complaint [hereinafter "Comp."], ¶¶ 1, 89).

- Plaintiffs Kirby, Porpiglia, Lynn-Ette, and Cahoon have all been issued Certification and Bargaining Orders. (Comp., ¶¶ 147–58, 163, 185, 187, 205, 208, 209; Comp., Ex. 13, 21.) PERB continues to enforce those orders, and the agency has denied Plaintiffs' requests to stay enforcement. (Id.)

- Plaintiffs Kirby, Porpiglia, Lynn-Ette, and Cahoon are subject to state-ordered mediation with labor unions to bargain over terms and conditions of employment, including their H-2A workers. (Comp., ¶¶ 164, 188, 207, 247, 248; Comp., Ex. 14.)  In each case, 30 days have elapsed since the agency appointed a mediator. (Id.) After 30 days in mediation, the statute allows the union to petition for impasse arbitration, which means that PERB "shall refer the dispute" to a state-designated "arbitrator" who will issue a "final and binding" determination of all "matters in dispute." See SERA § 702-b.

- Union negotiators have threatened to file for impasse arbitration against the Farm Plaintiffs. (Comp., ¶ 174.) The next time that the union declares an impasse, the State will order the parties to arbitrate. See SERA § 702-b(3).

- Plaintiffs Kirby, Lynn-Ette, and Porpiglia have been presented with "proposed" collective bargaining agreements that could be imposed on them through the arbitration process. (Comp., ¶¶ 174, 189, 210, Ex. 17.) These proposals include provisions that are irreconcilable with Plaintiffs' obligations under the federal H-2A regulations, and provisions that violate the constitutional rights of Plaintiffs and their employees. Specifically, these proposed contracts would compel the farms to:

  o "Immediately discharge or suspend" any employee—including H-2A workers—who does not join the union and agree to dues deduction. (Comp., Ex. 17, pp. 1-2).

  o "Deduct from each employee's pay all periodic dues or agency fees." (Id.).

  o Require Plaintiffs to "recall" H-2A workers "in order of seniority," without regard to Plaintiffs' federal law obligations otherwise.  (Id.).

  o Provide union officials the "right of access to Company premises."  (Id.).

  o Require Plaintiffs to subsidize union speech through mandatory union "bulletin boards." (Id.).

- PERB continues to prosecute multiple unfair labor practice charges against Plaintiffs Porpiglia, Crist Bros, Kirby, and Lynn-Ette including charges alleging violations of SERA § 704-b(2)(c), which makes it unlawful to either "discourage union organization" generally or "discourage an employee" from engaging in union-related activities. (Comp. ¶¶ 118, 119, 130, 132, 166, 182, 200; Comp., Ex. 7, Ex. 11, Ex. 14).

- PERB continues to prosecute an unfair labor practice charge against Plaintiff Porpiglia alleging that Porpiglia did not "recall" H-2A workers  in 2023, after these temporary guestworkers' 2022 term of employment ended. (Comp. ¶¶ 166–170; Comp. Ex. 15, 16.) This charge seeks the remedy of "immediate reinstatement" of these H-2A workers (a remedy contemplated by SERA § 706(3)), some of whom are ineligible for H-2A visas and are not currently in the United States. Porpiglia filed a Motion to Dismiss highlighting its conflicting obligations under the federal H-

2A regulations. (Comp., ¶ ¶ 168–72; Comp., Ex. 16). PERB declined to dismiss the charge and instead signaled that the agency will process the charge. (Comp., ¶ ¶ 171–72.)

- Plaintiffs' fruit and vegetable growing operations are currently in season, and Defendants' ongoing and threatened enforcement actions threaten to disrupt farming operations, crop yields, customer relationships, and employee relationships and goodwill. (Comp., ¶ ¶ 120, 175, 190, 212, 249.)

- Plaintiffs have a credible fear of prosecution for expressing opinions that could be construed as "discouraging union organization." (Comp., ¶ ¶ 121, 176, 191, 213, 250.)

- Some of the Farm Plaintiffs' current H-2A work contracts are set to end within two months, and federal law requires Farm Plaintiffs to permanently discharge H-2A workers when their contract term ends. Farm Plaintiffs fear the threat of having to answer unfair labor practice charges for permanently discharging these workers without providing them a right to "recall," and they cannot provide H-2A workers any "recall" rights without violating H-2A regulations. (Comp., ¶ ¶ 122, 177, 192, 214, 251).

- Plaintiffs intend to continue operating their farms consistent with generally applicable state and federal labor laws, including federal H-2A regulations, and their continued operations are jeopardized by the State's ongoing and threatened targeted enforcement actions. (Comp., ¶ ¶ 123, 178, 193, 215, 252.)

Absent injunction, Plaintiffs and all agricultural employers in New York face these imminent harms and threats of enforcement. See Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc., 477 U.S. 619, 625–626, n. 1 (1986) ("If a reasonable threat of prosecution creates a ripe controversy, we fail to see how the actual filing of the administrative action threatening sanctions in this case does not."). The Court should also "take the threatened [PERB] proceedings into account because administrative action, like arrest or prosecution, may give rise to harm sufficient to justify pre-

enforcement review." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158-67 (2014). The credibility and immediacy of the threat faced by Plaintiffs "is bolstered by the fact that authority to file a complaint with [PERB] is not limited to a prosecutor or an agency." Id. In fact, nothing in the text of SERA limits "the universe of potential complainants" to state officials, or even to employees or labor unions. Id.; see SERA § 704, 704-b.

## II.    PLAINTIFFS MEET THE STANDARD FOR INJUNCTIVE RELIEF.

"In the Second Circuit, the standard for a temporary restraining order is the same as for a preliminary injunction." Sec. & Exch. Comm'n v. Morgan, No. 1:19-CV-00661 EAW, 2019 WL 2385395, at *4 (W.D.N.Y. June 5, 2019). Additionally, "[t]he standard for entry of a preliminary injunction or a temporary restraining order overlaps substantially with the standard for a stay." Lincoln Fin. Sec. Corp. v. Foster, No. 20-CV-1132, 2020 WL 6150916, at *3 (D. Conn. 2020).

A plaintiff seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

Here, Plaintiffs' likelihood of success on the merits supplies the dispositive factor. If even one of Plaintiffs' constitutional claims has a likelihood of success on the merits, Plaintiffs satisfy the second Winter factor because "[t]he denial of a constitutional right ordinarily warrants a finding of irreparable harm, even when the violation persists for 'minimal periods' of time." A.H. v. French, 985 F.3d 165, 184 (2d Cir. 2021) (citation omitted). Moreover, as thoroughly detailed above, Plaintiffs face irreparable harm from Defendants' ongoing and threatened actions, including potential civil and criminal penalties. See, e.g., SERA § 709.

Plaintiffs satisfy the third Winter factor because "the balance of the equities favors granting the injunction, since the Plaintiffs face a deprivation of their constitutional rights." CompassCare v.

<u>Cuomo</u>, 465 F. Supp. 3d 122, 159 (N.D.N.Y. 2020). And Plaintiffs satisfy the fourth <u>Winter</u> factor because "enjoining enforcement of a statute that potentially violates citizens' constitutional rights is in the public interest." <u>Id.</u> <u>See also</u> <u>Baird v. Bonta</u>, No. 23-15016, 2023 WL 5763345, at *2 (9th Cir. Sept. 7, 2023) ("When, like here, the nonmovant is the government, the last two <u>Winter</u> factors 'merge.'").

Finally, because Plaintiffs only seek a prohibitory—not a mandatory—injunction, Plaintiffs face a comparatively low burden and only need to show "either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party." <u>Christian v. Nigrelli</u>, 642 F. Supp. 3d 393, 403 (W.D.N.Y. 2022). The heightened "clear or substantial likelihood of success on the merits" standard does not apply here because Plaintiffs do not seek to compel the government to act. <u>Id.</u> <u>See also</u> <u>Hund v. Cuomo</u>, 501 F. Supp. 3d 185, 207 (W.D.N.Y. 2020) ("An injunction that enjoins a defendant from enforcing a regulation clearly prohibits, rather than compels, government action by enjoining the future enforcement." (quotations omitted)). Rather, Plaintiffs' narrow request for injunctive relief preserves the status quo, as this Court has recognized: "the Constitution and the Bill of Rights represent the status quo—not 2022 legislation on the books for a few months." <u>Nigrelli</u>, 642 F. Supp. 3d at 404.

Once a likely constitutional violation has been shown, "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." <u>Hutto v. Finney</u>, 437 U.S. 678, 688 n.9 (1978) (citation omitted). It is "entirely appropriate" for courts "to bring an ongoing violation to an immediate halt." <u>Id.</u>  Courts "may not deny a preliminary injunction motion and thereby 'allow constitutional violations to continue simply because a remedy would involve intrusion into' an agency's administration of state law." <u>Baird</u>, 2023 WL 5763345, at *3 (quoting <u>Brown v. Plata</u>, 563 U.S. 493, 511 (2011)).

III.    **PLAINTIFFS HAVE A LIKELIHOOD OF SUCCESS ON THE MERITS.**

New York's statutory and regulatory scheme includes a number of facially unconstitutional provisions. Other violations stem from Defendants' official policies and practices and their applications to Plaintiffs. In either respect, under settled constitutional law principles, Plaintiffs are likely to succeed on the merits of their claims. As set forth below and further elaborated upon in Counts I through XI of the Complaint, Defendants have committed, continue to commit, and threaten to commit a number of substantial constitutional violations.

A.  **The Act's vague prohibition on "discouraging" union activity violate farmers' First Amendment and Due Process rights.**

Laws that restrict speech based on the viewpoint of the speaker are *per se* invalid under the First Amendment. Pleasant Grove City v. Summum, 555 U.S. 460, 469 (2009) (noting that content-based restrictions "must satisfy strict scrutiny," but "restrictions based on viewpoint are prohibited"). The FLFLPA amended SERA to prohibit agricultural employers from expressing a disfavored opinion on a political issue: unions.[2] Specifically, under SERA § 704-b, employers cannot "discourage union organization." This prohibition not only targets specific speech content, but it also restricts a viewpoint—no restriction exists on an employer's right to *encourage* union organizing. No other state or federal labor statutes include such a broad prohibition, which should come as no surprise given that the Supreme Court has expressly recognized "the First Amendment right of employers to engage in noncoercive speech about unionization." Chamber of Commerce of the U.S. v. Brown, 554 U.S. 60, 67 (2008). In fact, in recognition of the First Amendment's applicability to labor relations, the federal National Labor Relations Act ("NLRA") expressly *permits* "expressing of any views, argument, or opinion, or the dissemination thereof." 29 USC § 158(c). New York law provides the

---

[2] By only restricting the speech of one targeted group of individuals—agricultural employers—the statute also violates the Equal Protection Clause.

opposite. <u>Compare</u> 29 USC § 158(c) <u>with</u> SERA § 704-b. New York's ongoing maintenance and enforcement of this speech restriction flagrantly violates core First Amendment rights.

This Section of the Act also violates the Fourteenth Amendment's Due Process Clause because "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," and "it authorizes or even encourages arbitrary and discriminatory enforcement." <u>See</u> <u>Hill v. Colorado</u>, 530 U.S. 703, 732 (2000) (listing the "two independent reasons" why "[a] statute can be impermissibly vague."). Neither the Act itself nor PERB's regulations define the word "discourage." Nothing can cure this statute's multiple fatal constitutional infirmaries.

**B. New York's card-check plus compulsory arbitration regime infringes on fundamental speech, association, and equal protection rights without due process.**

With its 2020 enactment of the FLFLPA, New York became the only jurisdiction in the country 1) to disenfranchise private sector workers by providing no right to a secret ballot vote for union representation; 2) prevent workers from petitioning for decertification of a bargaining representative; 3) render dues deduction authorization cards effectively irrevocable, state-enforced subsidies to labor unions; and 4) compel private parties into binding arbitration where the State drafts and enforces targeted workplace regulations unique to each employer . Despite public statements that the FLFLPA simply extends NLRA labor protections to agriculture, the Act deviated from the federal system in several important—and ultimately unconstitutional—ways.

**a. The State's compulsory unionization scheme represents an unprecedented—and unconstitutional—deviation from established labor law principles.**

As illustrated through the circumstances of the Farm Plaintiffs, the process plays out as follows. First, labor unions have unfettered power to collect dues deduction authorization cards without oversight or regulation. Under the PERB regime, workers are not even required to be employed at the time they sign a card, and the cards can be signed outside of New York and even outside of the country. (Comp. ¶¶ 90–98, 110, 147, 149, 150, 185; Comp., Ex. 18.)  Unions can

effectively collect cards from any prospective worker in the hope that he or she will eventually be employed by a New York farm. The union then submits these cards to an administrative officer with unreviewable power to adjudicate their validity. (Comp. ¶ ¶ 150, 230, 233, 245, 355.)

Although there is no union campaign and no opportunity for the employer to express their views to workers before they are presented with union cards, the cards are "the functional equivalent of a vote." (Comp.¶ ¶ 147, 150, 205). Yet, unions do not have to present a "ballot" to every employee they seek to represent. Instead, the State delegates to unions the power to select which employees can "vote," and workers have no ability to vote "no." Neither PERB nor the employer knows how many employees were asked, but declined, to sign a union card.

This unilateral *card-check* system is ripe for abuse, and indeed has been abused. Plaintiffs Crist Bros, Kirby, and Porpiglia each submitted evidence that the union obtained card signatures through fraud and coercion. (Comp., ¶¶ 98, 145; Comp, Ex. 6.) But PERB declined to investigate. (Comp., ¶¶ 144, 145, 147, 185.) Even when workers themselves told the Agency that they never intended to "vote" for the union, PERB declined to act. See UFW v. Porpiglia, CU-6695, 56 PERB ¶ 4406, 2023 WL 3963573 (April 12, 2023) ("That employees may have changed their minds about signing a card is not a reason to allow employees to revoke their authorization …. These authorizations serve as the functional equivalent of a vote and are not to be lightly set aside."); UFW v. Kirby Farms, CU-6696, 56 PERB ¶ 4402, 2023 WL 3071143 (March 16, 2023) ("That employees may have felt misled or have changed their minds after hearing 'different information' from Kirby is not a reason to allow employees to revoke their authorization ….").

The significance of these cards cannot be understated. Not only do the cards serve as "votes" for exclusive representation, but the cards also permit the State to eventually compel the Employer to deduct union dues and agency fees from workers' paychecks. The cards submitted by UFW to unionize the Farm Plaintiffs state, "I hereby authorize and instruct my employer to deduct any union

11

fees or tariffs as established by the UFW from any of my wages during each payment period and remit such amounts to the UFW." See, e.g., Kirby Farms, 2023 WL 3071143.

Upon the union submitting these effectively irrevocable cards to PERB, if the Agency determines that a majority of the workers employed in the bargaining unit have signed cards, then the union gains certification and the employer is ordered to bargain. (Comp. ¶¶ 90–98, 110, 147, 149, 150, 185; Comp., Ex. 18.) The proof of certification (signed cards) is not provided to the employer and the certification process is conducted entirely by PERB. Upon certification, PERB deems the union the "exclusive bargaining representative" of all current and future workers in the bargaining unit—including current workers who never even knew that a union organizing campaign was underway, much less signed authorization cards. While union organizers have the unfettered right to speak freely and gather card signatures at any time, the statute provides no comparable right to the employer.

As soon as 40 days after the certification order, however, the union can declare impasse. See SERA § 702-b. PERB has never rejected a union's declaration of impasse. Instead, the State orders the employer to negotiate with a state-appointed mediator. (Comp., Ex. 14.) 30 days thereafter, either party can initiate the compulsory impasse arbitration process. SERA § 702-b(3)(c). The state-designated arbitrator then becomes the master drafter of a purported "collective bargaining agreement" that is neither collectively bargained nor agreed-upon by the parties to whom it will apply. This process applies even though the parties never entered into an arbitration agreement nor otherwise consented to this method of dispute resolution. The arbitrator has broad discretion to decree rules and procedures that can govern all aspects of a farm's operations and employment relations. The decree promulgated by the arbitrator "shall be final and binding upon the parties." SERA § 702-b(3)(iv).[3]

---

[3] Although the Section 702-b seemingly allows for judicial review "by a court of competent jurisdiction in the manner prescribed by law," New York law applies a highly deferential standard of review to arbitration awards, analogous to the FAA. See NY CPLR § 7511.

Under the FLFLPA, the state-designated arbitrator can bind the farm and its current and future employees in perpetuity—although Section 702-b provides that arbitrator-compelled agreements must expire after two years, Section 704(2)(b) requires employers to "continue all the terms of an expired agreement until a new agreement is negotiated." The Act contemplates that such agreement will require workers to pay—and employers to facilitate deductions—of union dues and agency fees as a condition of employment. See SERA § 704(5).

> **b. The compulsory unionization scheme violates the First Amendment rights of both farmers and farm laborers.**

The First Amendment protects more than the right to speak freely and to associate with others. It also protects "the right to *refrain* from speaking," Wooley v. Maynard, 430 U.S. 705, 714 (1977) (emphasis added), and the "freedom *not* to associate," Roberts v. U.S. Jaycees, 468 U.S. 609, 623 (1984) (emphasis added). "[S]tate action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." NAACP v. Alabama, 357 U.S. 449, 460-61 (1958).

In the seminal Jones & Laughlin decision, the Supreme Court upheld the constitutionality of the NLRA. NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1 (1937). "It was seriously contended that Congress could not constitutionally compel an employer to recognize a union and allow his employees to participate in setting the terms and conditions of employment." H. K. Porter Co. v. NLRB, 397 U.S. 99, 105 (1970) (describing Jones & Laughlin and noting its continued validity). In holding that the federal labor law withstood constitutional scrutiny, the Court explained that "the statute goes no further than to safeguard the right of employees to self-organization and to select representatives of their own choosing for collective bargaining." Jones & Laughlin, 301 U.S. at 33. In the very next sentence, the Court characterized employees' rights "to organize and select their representatives" as "a fundamental right." Id. The Court went on to extoll the ultimate backstop of "freedom of choice," which justified the constitutionality of the NLRA's regulatory framework. Id. at 34.

13

Employers likewise have First Amendment rights to opine on the choice of labor representative in their workplace. "The guaranty of freedom of speech and assembly to the employer and to the union goes to the heart of the contest over whether an employee wishes to join a union. It is the employee who is to make the choice and a free flow of information, the good and the bad, informs him as to the choices available." NLRB v. TRW-Semiconductors, Inc., 385 F.2d 753, 760 (9th Cir.1967). See also NLRB. v. Gissel Packing Co., 395 U.S. 575, 617 (1969) (holding that "an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board"). The FLFLPA includes none of these constitutional safeguards. Under New York law, if PERB certifies a labor union as the exclusive representative of a workplace, both the employer and all workers in the bargaining unit must associate with the labor union.[4] An employer's refusal to bargain constitutes an unfair labor practice. See SERA § 704(6).

Agricultural employers, like the Farm Plaintiffs here, must bargain even when serious doubts exist as to the actual desires of the workers—PERB does not adhere to "the long-standing rule that an employer is under no obligation to bargain with a union if it has reasonable and good faith grounds for doubting the union's continued majority status." Dow Chemical, Texas Division v. NLRB, 660 F.2d 637, 657 (5th Cir. 1981). Under SERA, a union need not even have its submitted card signatures validated, witnessed, or authenticated in any way; the unreviewable card counting process offends traditional notions of fairness and transparency. See Kirby Farms, 2023 WL 3071143 ("Review of dues deduction authorization cards is a purely internal administrative matter for the hearing officer"). Because employees have no way of knowing whether fraudulent authorization cards were submitted

---

[4] As the Supreme Court has recognized, and as true here, "[d]esignating a union as the employees' exclusive representative substantially restricts the rights of individual employees." Janus v. AFSCME, 138 S. Ct. 2448, 2460 (2018). "Among other things, this designation means that individual employees may not be represented by any agent other than the designated union." Id.

on their behalf, this card-check system cannot replicate the reliability and freedom of expression provided by a secret ballot election, preceded by notice, in which all employees can participate.

Incredibly, if an employer does not provide a sufficiently complete written response to the Agency's request for information regarding the bargaining unit within eight days, PERB actually absolves itself of any duty to verify whether a union actually has majority support. PERB applied this policy to issue a certification and bargaining order against Plaintiff Cahoon Farms: "To the extent that Cahoon Farms seeks to argue that if non-H-2A employees were included in the calculation of the unit, the UFW would not have had sufficient dues deduction authorization cards to establish majority support, as explained above, the time to make this argument and provide supporting evidence has passed." UFW v. Cahoon Farms, CU-6729, 56 PERB ¶ 4409, 2023 WL 5949195 (August 3, 2023). In other words, under New York law, the "calculation" of whether a union has "sufficient" cards "to establish majority support" will be based solely on the word of union organizers if the employer inadvertently misses a procedural deadline. To the extent an infringement on freedom of association served a compelling state interest when based on promoting collective bargaining, that justification evaporates under these circumstances, where PERB expressly condones certification of an "exclusive representative" of a labor union that may have never had majority support in the first instance.

Consistent with that position, PERB has summarily rejected any attempt to challenge the validity of dues deduction cards by employers and workers alike. PERB maintains that a "an employee's change of mind due to alleged misrepresentations is an insufficient basis to invalidate a timely, signed dues deduction authorization card." Kirby Farms, 2023 WL 3071143, CU-6696, at *21. At the same time, PERB sees "no basis" for "investigating the validity of the signatures on the cards." Id. at *27. Plaintiffs do not challenge an isolated or rogue administrative decision—these rules constitute the official policies and practices of PERB: "The SERA and the FLFLPA do not provide for withdrawal or revocation of cards." (Comp., Ex. 2, p. 3).

In fact, the State gives unions full discretion to govern the revocation procedures. Porpiglia, 2023 WL 3963573 (refusing to "allow[] revocation outside the terms set forth in the cards themselves"); Kirby, 2023 WL 3071143 (same). Nothing in SERA or the PERB regulations standardizes or limits the "terms" of revocation that unions may include on their printed cards. PERB essentially delegates to third-party labor unions full power to decide how long a signed card remains valid. Moreover, the State relies on these cards for numerous enforcement actions: 1) as the basis to compel farms to bargain with a labor union;  2) to certify bargaining units that encompass "all agricultural employees" of an employer,; and 3) to compels farms to enter into state-drafted "agreements" with labor unions that can require farms to deduct union dues and agency fees from the paychecks of *all* workers in the bargaining unit, even if the workers never consented to such deductions. See SERA § 702-b; § 704(5).

These provisions and applications of SERA directly offend the constitutional rules set forth in Janus, 138 S. Ct. 2448. In Janus, the Supreme Court unequivocally held that a state cannot constitutionally implement a regulatory scheme where "employees are forced to subsidize a union, even if they choose not to join and strongly object to the positions the union takes in collective bargaining and related activities" Id. at 2460. Such an arrangement "violates the free speech rights of nonmembers by compelling them to subsidize private speech on matters of substantial public concern." Id.[5] The arrangement circumscribed in Janus is exactly the same as New York's arrangement here, with the exception that the Illinois employees in Janus at least had the right to vote, unlike New York farm laborers.  This concern is not hypothetical. Every proposed contract that has

---

[5] Although Janus involved public sector employees, the Court issued its 2018 ruling in a landscape where no state had applied a compulsory unionization regime to the private sector. Before the FLFLPA, private employers and labor unions in New York (as in other states) were free to contract over requiring union fee deductions as a condition of employment—but the State was not involved, and certainly did not compel such deductions.  Through the enforcement of compulsory card-check unionization to private sector employers and employees, the State involves itself in every step of the process, and that state action triggers the First Amendment's full scope of protections.

been presented to the Farm Plaintiffs has included a dues deduction and closed shop clause. (Comp., Ex. 17). That State-enforced contract would expressly violate the <u>Janus</u> rule: "Neither an agency fee nor any other payment to the union may be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay. By agreeing to pay, nonmembers are waiving their First Amendment rights, and such a waiver cannot be presumed." <u>Janus</u>, 138 S. Ct. at 2486.

For a state to compel union payment deductions from a worker paycheck after <u>Janus</u>, the state needs "clear and compelling" evidence that the employee consented to such a deduction and waived his First Amendment right (<u>id.</u>), but New York completely flips that rule: the State *presumes* that all dues deduction authorization cards submitted by the union are valid. (Comp. ¶ 245; Ex. 18.) The State then places the burden on *employers* to proffer "clear and convincing evidence that the dues deduction authorizations . . . are fraudulent or were obtained through coercion." SERA § 705(1). Moreover, unlike all other states and federal law, New York has declined to "establish a process for decertification" and "the statutes do not expressly provide for decertification." (Comp., Ex. 2, p. 11).[6]

New York's compulsory card-check unionization scheme, combined with its lack of decertification procedures, and the threat of state-enforced civil and criminal penalties represents the most severe infringement of First Amendment rights ever enacted by a state in the labor law context. Agricultural employers continue to be compelled to associate, negotiate, and contract with third-party union organizers who have been forcibly designated the "exclusive representative" of employees who affirmatively disavow such representation.

---

[6] Even public sector employees in New York have decertification rights. <u>See</u> 4 N.Y.C.R.R. § 201.2. First Amendment concerns are even more heighted here in the private sector context. <u>See</u> <u>Locurto v. Safir</u>, 264 F.3d 154, 166 (2d Cir. 2001) ("the government enjoys significantly greater latitude when it acts in its capacity as employer than when it acts as sovereign").

### c. The FLFLPA's compulsory impasse arbitration process violates the Due Process and Equal Protection rights of agricultural employers.

Much like its freedom of association safeguards, the constitutionality of the NLRA is premised on its inherent protection of freedom to bargain: the NLRA "does not compel agreements between employers and employees. It does not compel any agreement whatever." Jones & Laughlin, 301 U.S. at 45-46 (upholding the constitutionality of the NLRA). In H. K. Porter Co. v. NLRB, the Court faced "the first time in the 35-year history of the [NLRA] that the Board has ordered either an employer or a union to agree to a substantive term of a collective-bargaining agreement." 397 U.S. 99, 106 (1970). In striking down that administrative order, the Supreme Court reaffirmed the NLRA's constitutional backstops, including "that the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements." Id. (quoting NLRB v. American Ins. Co., 343 U.S. 395, 404 (1952)). The NLRA remains constitutional because it merely provides a "free opportunity for negotiation with accredited representatives of employees." Jones & Laughlin, 301 U.S. at 45-46. Allowing the government "to compel agreement when the parties themselves are unable to agree would violate the fundamental premise on which the [NLRA] is based—private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract." H. K. Porter, 397 U.S. at 108.

Notwithstanding that backdrop, New York's FLFLPA implements a compulsory arbitration regime where the State vests a designated "arbitrator" with the power to impose rules and regulations that will have the force of law on only one employer. See SERA § 702-b. The State permits its arbitrator to impose substantive contractual terms on private parties. This unprecedented statutory scheme targets the State's agricultural employers and farm laborers in violation of settled constitutional law.

First, as thoroughly detailed in Plaintiffs' Verified Complaint, the State provides no meaningful procedural due process protections to agricultural employers prior to certifying a labor

18

union as the exclusive bargaining representative. PERB provides neither meaningful notice nor opportunity to be heard to employers before commencing these adversarial proceedings against employers under the threat of civil and criminal penalty. See SERA § 709.

The arbitration decision itself will necessarily compel the employer to change its workplace rules, employment practices, business practices, and any number of unspecified issues that implicate a host of liberty and property interests protected by the Due Process Clause. See, e.g., Rice v. Vill. of Johnstown, 30 F.4th 584, 595 (6th Cir. 2022) ("A business owner can have a protected property interest in the continued operation of the business."); Spinelli v. City of New York, No. 02 CIV. 8967 RWS, 2010 WL 4273285, at *1 (S.D.N.Y. Oct. 28, 2010) ("The liberty interest one has in pursuing one's livelihood is a strong one[,]" even when "Plaintiffs were not deprived of their ability to run their entire store."). See also Hund, 501 F. Supp. 3d at 203 ("The right to pursue a profession is a liberty interest for which one enjoys substantive due process protection.").

Among other due process problems, SERA's compulsion regime declines to limit the scope of "matters in dispute" that the arbitrator can determine; the State delegates its adjudicatory and legislative power to one arbitrator (as opposed to the more standard three-arbitrator panel, or, as more typical when making such consequential determinations, a jury); and the statute has no binding standards. The Section 702-b enumerated factors are merely for the arbitrator to "take into consideration," and the arbitrator is permitted to consider "any other relevant factors." The compulsion regime gives the arbitrator complete freedom to assign whatever weight—or none at all—to any factor. See Holmes v. N.Y. City Hous. Auth., 398 F.2d 262, 265 (2d Cir. 1968) (holding lack of "ascertainable standards" for denial in housing applications violative of due process); White v. Roughton, 530 F.2d 750, 753-54 (7th Cir. 1976) ("[A] procedure, vesting virtually unfettered discretion in [the Administrator] and his staff, is clearly violative of due process.").

Second, SERA Section 702-b runs afoul of the fundamental principle that laws and regulations should apply generally to all members of society, thereby violating the Equal Protection Clause. See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (ruling that laws and regulations that arbitrarily burden individuals as individuals are impermissible "class-of-one" laws that violate the Constitution's equal protection guarantees). To the extent the State may have a cognizable interest in subjecting the agricultural community to these targeted regulations, which do not apply to any other private sector industry, the State does not—and cannot—justify disparate treatment *within* this class of agricultural employers. And the impasse arbitration provisions do just that.

Disturbingly, there is nothing within the compulsion regime to prevent the imposition of an agreement that disadvantages a single employer without applying to similarly situated competitors. In fact, by design, the scheme only applies to farms under union certification orders, and each of those farms will come out of the arbitration with a unique set of regulations imposed on them by the State. The vague enumerated factors that the arbitrator is to "take into consideration" exacerbate this problem. For instance, one factor is "the financial ability of the agricultural employer to pay." See SERA § 702-b(3)(c)(iii). Of course, every agricultural employer will have a different ability to pay. Further, the factor evaluating "the terms of collective bargaining agreements negotiated between the parties in the past" *requires* discrimination between unionized and non-unionized employers.

In enacting the SERA arbitration scheme, the State provided private agricultural employers even less due process protections than it provides to public sector employers who have long been subject to impasse arbitration. See  N.Y. Comp. Codes R. & Regs. tit. 4, §§ 205.3; 205.7; 209.4. In fact, nearly every other impasse arbitration statute includes significant more procedural safeguards

than New York's law—and those other statutes only apply to the public sector, where the government acts as the employer and has a *lesser* constitutional burden.[7]

When combined with the ad hoc card-check process, the lack of decertification options, and SERA § 704's announcement that employment can be conditioned on union membership, the compulsory arbitration scheme's disparate treatment of agricultural employers and of individual farms directly implicates fundamental rights, including First Amendment rights, and must be subjected to strict scrutiny. See Janus, 138 S. Ct. at 2448; Jones & Laughlin, 301 U.S. at 33 (right to freely select labor representatives is a "fundamental right"). See also SERA § 700 (describing collective bargaining as an exercise of "freedom of association"). In fact, "the Second Circuit held that 'a specific deprivation of [plaintiff's] opportunity to seek employment caused by a statutory impediment established by the state' supported a substantive due process claim." Hund, 501 F. Supp. 3d at 203 (quoting Valmonte v. Bane, 18 F.3d 992, 1001 (2d Cir. 1994)).

Where, as here with respect to agricultural employers and the subclass of unionized agricultural employers, there is an "absence of precedent" for "singling out a certain class of citizens for disfavored legal status," a state law's classification can fail even under rational basis review. Romer v. Evans, 517 U.S. 620, 633 (1996) (striking down state law under rational basis framework). Indeed, New York has expressly declared that agricultural employers—unlike every other private *or* public employer—are deprived of their right to freely bargain or at least to an impartial three-member panel with notice of standards and meaningful judicial review.[8]

---

[7] Philip Rosen and Richard Greenberg, *Constitutional Viability of the Employee Free Choice Acts's Interest Arbitration Provision*, Hofstra Labor and Employment L. J.: Vol. 26: Iss. 1, Article 13 (2008), available at: http://scholarlycommons.law.hofstra.edu/hlelj/vol26/iss1/13

[8] See also David A. Schwarz, *Compelled Consent: Wolff Packing and the Constitutionality of Compulsory Arbitration*, N.Y.U, Journal of Law & Liberty, Vol. 12:24, 15-123 (2018), available at: https://tinyurl.com/2k8ptsmv.

**C. PERB's structural and procedural defects preclude New York farms from exercising their rights to due process.**

Plaintiffs' Verified Complaint illustrates PERB's staggering deprivation of due process in the cases of each of the Farm Plaintiffs. (Comp., ¶¶ 124–78, 216–52.) Many of those flagrant violations have been repeated in numerous cases, over the vigorous objections of each employer. Equally flagrant are the due process violations endemic to the agency itself.

"A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." Reed v. Goertz, 598 U.S. 230, 236 (2023). As detailed in the Verified Complaint, the State has deprived Plaintiffs of numerous protected interests. See, e.g., Chernin v. Lyng, 874 F.2d 501, 505 (8th Cir. 1989) ("The [Supreme] Court has continued to hold that both employees and employers have an interest in the employment relation protected from arbitrary government action by the Due Process Clause.").

In fact, Plaintiffs have been denied basic rights "central to the Constitution's command of due process," including "[t]he right to prior notice and a hearing." United States v. James Daniel Good Real Property, 510 U.S. 43, 53 (1993). Even when the complained-of deprivation is a lesser liberty or property interest, and even in administrative proceedings, the government must at least provide parties with fair procedures, an unbiased decision maker, a hearing, and a meaningful opportunity to respond. Goldberg v. Kelly, 397 U.S. 254, 269 (1970); Gibson v. Berryhill, 411 U.S. 564, 579 (1973) (stating principles of fairness are equally applicable to administrative as well as judicial proceedings). See also Jones & Laughlin, 301 U.S. at 46-47 (recognizing that the NLRA provides sufficient due process because, among other things, "[t]here must be complaint, notice and hearing" and "only when sustained by the court may the order be enforced."). As set forth in the Verified Complaint, PERB engages in a practice or policy of repeatedly denying agricultural employers their rights to hearings, notice, cross-examination, and a host of other processes that the constitution compels.

Additionally, "due process does not permit the same individual to issue the initial decision finding violations and order[] remedies, participate personally in the prosecution of the case … , and then make the final agency decision that will receive only deferential judicial review." Horne v. Polk, 242 Ariz. 226, 228 (2017). See also Withrow v. Larkin, 421 U.S. 35, 47 (1975). Here, PERB's inherent bias and lack of neutral decisionmaker represents serious due process violations—especially when balanced against the hardship faced by agricultural employers: indefinite union certifications, compelled bargaining, and state-drafted "arbitration awards" that can change every aspect of a farm's business and employment practices.

Until July 2023 and all times throughout the processing of the Farm Plaintiffs' matters until the respective Decisions, one individual—Sarah Coleman—held three positions concurrently: the agency's Acting Director, Deputy Chair of the Board, and Administrative Law Judge. (Comp., Ex. 8.) This co-mingling of investigative, prosecutorial, and adjudicative functions within the same agency is inherently egregious because one single individual performs all three functions. See Horne, 242 Ariz. at 228. As Deputy Chair, Coleman works hand in glove with the Board to set agency policy and even " draft[] Board decisions for review and adoption by the Board." [9] Where, as here, the same person who decided the case in the first instance may be the one who also writes the appellate-level decision, the right to appeal is illusory at best. This structure and function tainted the entire proceedings and renders the Orders issued—and which continue to be enforced—in the matters of Plaintiffs Kirby, Porpiglia, and Lynn-Ette *void ab initio*.

**D. Federal immigration law preempts the imposition of collective bargaining on temporary guestworkers subject to federally mandated H-2A work contracts.**

The Supremacy Clause prohibits states from enforcing or applying any law or regulation in a way that conflicts with federal law. Likewise, when an area of law involves "uniquely federal

---

[9] See https://perb.ny.gov/office-of-the-chairman/.

interests," that area is "so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced." Boyle v. United Technologies Corp., 487 U.S. 500, 504 (1988). State laws regulating migrant workers are prone to preemption because immigration is "an area traditionally of federal concern." Maine Forest Prod. Council v. Cormier, 51 F.4th 1, 6 (1st Cir. 2022) (holding Maine agriculture regulation preempted by federal H-2A program). See also Arizona v. United States, 567 U.S. 387, 394 (2012) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens.").

The United States has exercised its authority in the field of immigration by enacting the Immigration and Nationality Act ("INA"), as amended by the Immigration Reform and Control Act ("IRCA"), and numerous regulations pursuant thereto, including the statutory and regulatory scheme that sets forth and governs the H-2A visa program. (Comp., Ex. 18, pp. 7–15.) The INA preempts state laws that conflict with the INA or stand as an obstacle to its accomplishment or the execution of the full purposes and objectives of the United States government with respect to its passage and enforcement.

Applying SERA to H-2A workers conflicts with both the text and the purpose of the federal immigration statutes and the H-2A regulations. By requiring New York farms to collectively bargain with a third-party labor union regarding the terms and conditions set forth in the contracts of H-2A workers, the State is improperly regulating the field of immigration law and the employment of nonimmigrant temporary guestworkers who may only work in this country pursuant to the terms set forth by federal law. Crucially, all the typical subjects of union bargaining are already governed by H-2A work contracts. Compare  Harris v. Quinn, 573 U.S. 616, 642 (2014) (listing the subjects of collective bargaining as "the days of the week and the hours of the day during which an employee must work, lunch breaks, holidays, vacations, termination of employment, and changes in job duties") with 20 CFR § 655.122(b)–(p) (listing the mandatory terms of an H-2A work contract as including,

*inter alia*, job duties, meals, guaranteed number of hours, rates and frequency of pay, and termination for cause). By imposing collective bargaining obligations on farmers subject to H-2A work contracts, New York "attempts to override the specific H-2A work authorizations provided by federal law." Maine Forest Prod. Council v. Cormier, 586 F. Supp. 3d 22, 45 (D. Me.), aff'd, 51 F.4th 1 (1st Cir. 2022). Thus, the Supremacy Clause precludes enforcement of these state law provisions to H-2A program participants.[10]

## CONCLUSION

For the foregoing reasons, the Court should restrain application and enforcement of SERA to private sector farms in New York and to the Farm Plaintiffs until Plaintiffs' Motion for Preliminary Injunction can be heard, and the Court should permanently enjoin application and enforcement unless and until the Act is amended to address its many constitutional deficiencies.

Respectfully submitted, this 2nd day of October, 2023,

*/s/*Scott S. Allen Jr.
Scott S. Allen Jr.
LIPPES MATHIAS LLP
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202
T: 716.853.5100
sallen@lippes.com
Joshua H. Viau
Ga Bar No. 378557
*Pro Hac Vice Forthcoming*
Boris W. Gautier
GA Bar No. 152610
*Pro Hac Vice Forthcoming*
FISHER & PHILLIPS LLP
1230 Peachtree Street, N.E., Suite 3300
Atlanta, Georgia 30309
Tel. (404) 231-1400
jviau@fisherphillips.com
bgautier@fisherphillips.com
*Attorneys for Plaintiffs*

---

[10] A more comprehensive legal argument on the H-2A preemption issue is set forth in Exhibit 18 to Plaintiffs' Verified Complaint.